**SUPERMARKET SERVICES, INC.,**
**Plaintiff,**

v.

**HARTZ MOUNTAIN CORP., Defendant.**

**No. 74 Civ. 4267.**

United States District Court,
S. D. New York.

Oct. 8, 1974.

Willkie Farr & Gallagher by Louis A. Craco and David L. Foster, New York City, of counsel, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, by David Klingsberg and Robert Fink, New York City, of counsel, for defendant.

## OPINION AND ORDER

WERKER, District Judge.

This is an application for a preliminary injunction under section 16 of the Clayton Act, 15 U.S.C. § 26 (1970), and Rule 65 of the Federal Rules of Civil Procedure.

On September 30, 1974, plaintiff, Supermarkets Services, Inc., ("Services") filed a complaint in this Court against the defendant, Hartz Mountain Corporation ("Hartz"), for treble damages, preliminary and permanent injunctive relief. Services alleges violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) through territorial

and customer limitations allegedly imposed by Hartz on Services, and by Hartz's alleged monopolization or attempting to monopolize the sale and distribution of pet accessories and bird food, particularly to mass merchandising outlets.[1]

This Court refused to issue a temporary restraining order, but ordered the parties to appear on October 2nd for a hearing on the preliminary injunction aspects of the litigation. The facts set forth below summarize the affidavits and testimony given by both parties during nearly two days of hearings.

## BACKGROUND

Services, a subsidiary of the APL Corporation, is a sales-service distributor of non-food products including health and beauty aids, pet accessories, housewares, stationery, books, notions, cosmetics, cleaning aids, and shoe products to over 1,400 supermarkets, drug stores and department stores in an area reaching from Springfield, Massachusetts, west to Buffalo, New York, and Pittsburg, Pennsylvania, and south to North Carolina.

Services is known in the service merchandising trade as a "rack jobber" since it not only purchases non-food items from suppliers and resells them to mass merchandising outlets, but also performs a variety of service functions such as order taking, inventory control, stacking of merchandise, price marking, and cleaning and maintaining of display racks. According to its president, Services is the second or third largest rack jobber in the eastern United States, with total annual sales of over $40,000,000.

For the past several years, Services has been distributing pet supplies under a contractual arrangement with Hartz. Out of $40,000,000 in annual sales,

$1,200,000 is attributable to the sale of pet supplies. Services distributes Hartz products primarily in the Washington, D. C. area where it has three major customers, Peoples Drug Stores ("Peoples"), Dart Drug Stores ("Dart") and Grand Union Supermarkets. Services sells a wide variety of non-food products to Grand Union, but only pet supplies to Peoples and Dart. Services also sells Hartz to over fifty independent supermarkets in the Buffalo area which are serviced by one wholesaler, Peter J. Schmitt.

Hartz is one of the largest, if not the largest,[2] supplier of pet supplies in the United States, with annual worldwide sales of $151,000,000 and U. S. sales of $130,000,000. Hartz, under the brand names Hartz and Delta, sells a large variety of products for the care, feeding, grooming and general well being of pets including cages, foods, toys, collars and leashes.

Hartz distributes its products to over 50,000 stores through a distribution system of independent rack jobbers who take care of the functions of delivering the merchandise to stores, stocking the shelves, placing the merchandise, rotating the merchandise, removing shopworn and slow-moving goods, and setting up floor displays and promotions. Besides selling its products to distributors for resale, Hartz also sells directly to retail outlets and to that extent is a competitor with the distributors.

Hartz has spent over twenty-five years in developing a network of distributors with the ability to service its racks and thus help to maximize its sales. The Hartz products are placed on racks, with a typical four foot rack containing from 120–180 different products. According to Hartz, the key to its success is the servicing of these racks by the specially trained distributors.

---

1. For the purposes of the preliminary injunction hearing, Services is relying only on the alleged section 1 violation.

2. Leonard Stern, president of Hartz, testified that there are no industry statistics kept on market shares of corporations in the pet supply industry. Mr. Stern did say that Hartz probably had less than ⅓ of the market.

While Services claims that Hartz is the dominant force in the industry, and that all of the Services's customers have developed a strong brand loyalty for Hartz, Hartz maintains that it competes vigorously with several large competitors such as Sargeants, R. T. French and the Metafram Corporation.

## PRIOR DEALINGS OF THE PARTIES

Services's relations with Hartz started in 1967 when Services acquired the Richray Distributing Company, a large rack-jobber in the Washington, D. C. area. Richray had a "Distributor Contract" with Hartz which, *inter alia*, had a primary responsibility clause (although no territory was specified), and which required Richray to use its "best efforts" in the promotion, sale, and servicing of Hartz products. The contract was automatically renewable at one year intervals and Richray, and subsequently Services through Richray, distributed Hartz products under the contract until February 4, 1969, when a new contract was signed.

The new contract is essentially the same as the old, except it is now entitled "Service Distribution Contract," the words "on a service basis" have been added to the primary responsibility clause, the words "through service" have been added to the best efforts clause, and the clause permitting the distributor to exercise his independent business judgment has been expanded.[3]

Services distributed Hartz products under both the 1963 and the 1969 Richray contracts through what is known for the purposes of this litigation as the "Old Program." The Old Program was, and still is, a conventional servicing program where merchandise and services are sold together at a charge of retail price less a discount without regard to the volume of products per delivery. Services would perform all its rack jobbing functions under the Old Program including inventory control, promotion, and, at least as to Hartz products, fully servicing and maintaining the display racks.

In mid-June of 1974, Services announced what it called a "New Program" which is basically a form of cost plus wholesaling. The cost of goods and services are no longer aggregated, and the price of each is specified. Retail outlets are now given the option of doing their own servicing or continuing to use the services provided by Services. The cost of warehousing is segregated and there is now a separate charge for

---

3. Clause 2 under the old contract reads: "2. The Distributor shall be primarily responsible for selling products to grocery stores in the following territory (hereinafter referred to as 'the territory') : [no territory was filled in]". Clause 2 now reads: "2. The Distributor shall be primarily responsible for selling products to grocery stores on a service basis in the following territory (hereinafter referred to as 'the territory') (if no territory is specified, then the territory shall be that which is presently primarily serviced by Distributor) : ———— [no territory filled in]."

Under the old contract, clause 8 reads: "8. Hartz Mountain may suggest to the Distributor marketing methods and practices which Hartz Mountain believes may increase sales and the Distributor's profits from the sale of products to the Distributor's customers. The Distributor shall exercise its independent business discretion in determining whether or not to follow Hartz Mountain's suggestions." Clause 8 now reads: "8. Sup-

plier may suggest to the Distributor marketing methods and practices which Supplier believes may increase sales and the Distributor's profits from the sales of products to the Distributor's customers. The Distributor shall exercise its independent business discretion in determining whether or not to follow Supplier's suggestions. The Distributor is, and at all times shall be, an independent contractor, with the right of pricing his products as he determines to do so, selling merchandise where and to whom he wishes to do so, and handling any merchandise, provided, however, that in so doing, the requirements of Paragraph 6 of this Contract are complied with. Nothing contained in this Contract shall be construed as constituting the Distributor the partner, agent, or employee of Supplier or as authorizing the Distributor to create or assume any obligation or liability in the name of Supplier or to subject Supplier to any obligation or liability."

deliveries which is determined by the dollar volume of the order. In addition, retail outlets are no longer provided four weeks credit but are required to make a deposit equal to two weeks average volume in non-food items. Over five hundred stores, most of them current customers, have signed up for the new program and have put down $600,000 in refundable deposits.

As Services sees, it the New Program would increase its profits and at the same time reduce prices to the retail outlets and ultimately to the consumer. These results would be accomplished through the use of economies of scale which would reduce operating costs, increase productivity, and lead to purchasing economies. From the point of view of the retailer, profits may be increased, but in order to do so, the retailer must order a number of product lines from Services since the delivery charge is keyed to the dollar volume of his order. Since the Old Program, according to Services, is still available to any customer, the retailer has the following options: 1) he can stay with the old program and continue to make the same gross profit,[4] or 2) he can elect to go on the New Program, in which event he can increase his gross profit if he orders several lines of non-food products from Services.[5] Of course, a customer who

has only used Services for obtaining one line of product (such as Peoples Drug and Dart Drug) might prefer to continue to deal with its old distributors in the other non-food lines, and might also prefer to have Services continue to perform its service functions in the pet supply line. In such cases, the rational decision would be to remain on the Old Program, or to take the New Program but continue to buy services from Services. In point of fact, all new customers who have elected to try the New Program have taken full services, and the Schmitt account in Buffalo has gone from limited services to full services.

To Hartz, the New Program is anathema. The fact that retailers have the option to do their own servicing is particularly viewed with disfavor. Hartz contends that the New Program is not just another way of offering products to retailers, but is a complete change in the nature of Services's business with a decrease in emphasis on services, the key to Hartz's success. Hartz claims that such a drastic change constitutes a breach of its contract with Services.

The offering of the New Program triggered a series of meetings and conversations, described in detail below, which brought a period of seemingly amicable relations between the parties to a precipitous halt.[6]

4. According to a chart prepared by Services, a retail outlet which does an average weekly volume of $50,000 would have $2,500 in non-food sales, of which $150 would be in the pet supplies line. The cost to the retailers of $150 in retail pet supplies would be $97.50, yielding a gross profit of $52.50 or 35% on his pet supply line.

5. Whether or not the New Program could increase the gross profit of a retailer was disputed by both parties. In the figures supplied by Services, using the same $50,000 a week volume, and $150 in pet supply sales, then under the New Program, the cost to the retailer of $150 in pet supplies would be $91.30, yielding a gross profit of $58.70 or 39.1%. However, this increase depends upon how many lines of non-food products are purchased from Services. In Services's example, 13 lines of products with a weekly retail price of $2,500 were purchased. This

would allow the retailer to get a credit on his delivery charge and thus increase his profit. Of course, as Hartz pointed out, if the retailer only purchased pet supplies and not the other 12 lines, then on a $200 order he would have a delivery charge of $15, and compared to the Old Program, his gross profit would decrease. In addition, since the retailer must put down a deposit under the New Program, there is a financial factor which Services has calculated at ½ of 1%.

6. Prior to the offering of the New Program, Hartz had had some difficulties with Services in the area of servicing retailers due to high turnover in Services's personnel. However, no threat of termination was ever made, and Hartz admitted that it had similar difficulties with other distributors. There were two events which did cause concern between the parties. First, when Services was attempting to obtain the Schmitt stores, in

Prior to the official announcement of Services's New Program, Fern Caron, a Corporate Vice President of Hartz, had heard from Art Pym, a Hartz sales manager in the New England area, that Services was going to offer a cost plus wholesaling program. Caron reported this information to Leonard Stern, president of Hartz, who told Caron to arrange a meeting with Services' president, Ray Zager, to discuss the nature of the New Program. Caron called Zager and told him he would like to set up a meeting to discuss "a problem." Zager agreed to meet Caron at the Lobsterman cocktail lounge in New Jersey on September 6th.

## THE ZAGER-CARON MEETING

At approximately 3:30 p. m. on September 6th, Zager met with Caron at the Lobsterman for approximately two hours. At the preliminary injunction hearing, Zager, Caron and Stern (Caron had reported his version of the conversation to Stern) all testified as to their version of the meeting. According to Zager, Caron wanted to know what the New Program entailed. After Zager explained the program, Caron responded that he didn't want the New Program and the new price structure offered to any new customers outside of Services's territory. As for the old customers, Services could do what they wished, they could "give it away." Caron felt that Services would be upsetting Hartz's distribution pattern. Finally, Caron threatened that if Services did not stop offering the New Program to new customers, they would lose the Hartz line. Zager responded that Services would offer its New Program wherever it wanted, and to whatever customers it could find. Zager testified that the subject of services was never discussed.

The Caron version of the meeting differed markedly from Zager's. Caron testified that he asked Zager to explain Services's New Program, especially the concept of cost plus wholesaling. Zager explained that the company would be lessening services and the stores would be performing some of the services and thus saving money. Caron said he did not understand the entire concept, but that as far as pet supplies were involved, it was imperative that the stores get full service. Zager then said if he couldn't have Hartz, he would take on Sargeants and compete with Hartz. Caron told Zager to do what he thought right, but to think about it and call Caron in a few days. Caron claims that the subject of "termination" was never discussed. Caron called Stern immediately after the meeting and told him his version of the conversation. Stern testified and gave virtually the same version as Caron.

## THE DECISION TO TERMINATE

Subsequent to the meeting with Zager, Caron, on September 9th, called Zager to see if he had changed his position. Zager said he had not. Caron again called Zager on September 12th, and again received the same answer. Caron then reported this information to Stern and Lovitz, a senior officer of Hartz. Zager testified that on September 19th, he received a call from Lovitz who inquired whether Zager had changed his mind. Zager said no. Zager also claims that Lovitz said the "problem" was the offering of the New Program to new customers, and that there was no discussion with Lovitz about reduced services.

On or about September 19, Stern made the decision to terminate Hartz's relationship with Services. Stern testi-

Buffalo, Hartz apparently tried to persuade Schmitt to stay with its current Hartz distributor, and only relented when Schmitt threatened to drop the Hartz line. Second, in 1973, Dart Drug told Services that it planned to make its own arrangement with Hartz and would drop Services, and take on Point of Purchase as its distributor. After a meeting of several executives of both Hartz and Services, Hartz agreed that Services could keep the account.

fied that his decision was based on the information received from Caron relating to the meeting between Caron and Zager. Stern felt the cost plus wholesaling program was a significant change in the nature of Services's business and that because the retailers would receive fewer services, Hartz would ultimately suffer severe declines in its sales. Stern believed Services was breaching its contractual obligations to service the retailers and was not using its best efforts to promote Hartz products. Stern admitted that at the time he made the decision to terminate he did not have any information on the cost break down of Services's New Program, and that he did not know Services would still be offering full services to the retailers.

## THE HODES-STERN CONVERSATION

Robert Hodes, a partner in Willkie Farr & Gallagher, Services's attorneys, placed a call to Lovitz of Hartz and asked to speak to Hartz's lawyers about the termination. On September 24th, Stern returned Hodes's call. Hodes, Stern, and Arthur Andersen, Hartz's Vice President and General Counsel (who was in Stern's office when the call to Hodes was made) testified at the hearing with conflicting results. Hodes claims Stern told him Services was terminated because they were going outside the Washington D. C. area and that Services would be all over the Northeast. Stern informed Hodes of the contract with Richray and expressed his feeling that Services had breached the contract. Hodes was not aware of the existence of the contract so he asked Stern for some time to gather the facts before Services was terminated. Stern refused. Hodes testified that there was no mention of Services changing the nature of its business.

Stern testified that he told Hodes he was terminating the contract because Services was violating its contractual obligations by changing the nature of its business operations. Stern denied ever using the word "territory" or that Hodes had asked him for more time. Stern's testimony was backed up by Andersen who testified that he didn't hear Stern mention anything about a cut off because of Services going outside of any territory. Andersen had no recollection of Stern mentioning the word "Northeast."

## SUBSEQUENT EVENTS

At a point subsequent to Stern's decision to terminate and prior to the Stern-Hodes conversation, Stern and Caron discussed the possibility of approaching Services's old customers and telling them of the termination[7] and suggesting new distributors to them. Apparently, this plan was followed. Stern testified that he called Ira Waldbaum of the Waldbaum Drugstore chain. Stern said he had heard that Waldbaum had set up a test store in Yonkers, New York, under Services's New Program. Waldbaum replied that he had because he wanted to make more profit. Stern then convinced Waldbaum that Services's New Program might not be so profitable and Waldbaum finally agreed to drop the program after the test was finished.

Douglas Custer, Vice-President of sales for Services, testified to conversations he had with representatives of Dart, Peoples, and Grand Union. Custer was informed by these representatives that Hartz had told them of Services's termination. On October 2nd, Billy Hawes of Peoples Drug informed Custer that Peoples was switching to another distributor who had been suggested by Hartz.

According to Zager, Services's inventories of Hartz products are down 50% and several important items are completely out of stock. Hartz admits that it is no longer filling Services's orders and that the termination is final.

7. Hartz claims that because Services breached its contract by changing the nature of its business, no written notice of termination was necessary. In any event, on October 1st, written notice of termination was sent to Richray.

Now that the factual context of this litigation has been set forth, Services's claim for injunctive relief must be examined. Services seeks an injunction that would preliminarily enjoin Hartz from: (1) terminating Services as a distributor of Hartz's product line of pet accessories and supplies; (2) failing to fill in the normal course of business orders received from Services for Hartz's products; (3) imposing territorial or customer restrictions on Services's distribution of Hartz's products; and (4) coercing, suggesting, or communicating with customers or potential customers of Services with respect to such customers's refusing to buy from or deal with Services, or the availability to such customers from Services of Hartz's products.

## PRELIMINARY INJUNCTION STANDARDS

It has been repeatedly held in this circuit that a preliminary injunction is an extraordinary remedy. Gulf & Western Industries, Inc. v. The Great Atlantic and Pacific Tea Company, Inc., 476 F.2d 687, 692 (2d Cir. 1973); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed. 777 (1969). In a most recent case in this Circuit (Columbia Pictures Industries, Inc. v. American Broadcasting Companies, Inc., 501 F.2d 894 at 897 (1974), the standard for the issuance of such an injunction was set forth as follows:

"The standard factors which this court now considers upon an application for a preliminary injunction are well known: (1) clear likelihood of success on the law and the facts then available and possible irreparable injury, or (2) sufficiently serious questions on the merits making them fair ground for litigation and a balance of the equities tipping decidedly in favor of preliminary relief. Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973); Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea

Co., 476 F.2d 687, 692–693 (2d Cir. 1973)."

## PROBABILITY OF SUCCESS ON THE MERITS

■ The antitrust claim upon which plaintiff relied in the hearing was an alleged violation of section 1 of the Sherman Act (15 U.S.C. § 1) which provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations, is declared to be illegal * * * *"

It is Hartz's contention that there is no contract or conspiracy in restraint of trade, because the contracts with Services were simple service distribution contracts requiring Services to perform services with respect to Hartz's products in the mass merchandising outlets. When Services embarked upon a program which Hartz believed eliminated services, Hartz felt that Services had breached its contract and Hartz was at liberty to terminate the contract and refuse to deal with Services.

Services counters that Hartz's reasoning is a mere subterfuge, and that the true reason for the termination is that Services was offering its new program outside of the Washington, D. C. area, and was violating the customer and territorial limitations set up by Hartz. Services argues that these restrictions are *per se* illegal and fall within the doctrines announced in United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967) (vertical restraints); and United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal restraints).

Hartz's arguments raise the spectre of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, (1919). In that case the Supreme Court said:

"In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized

right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." (250 U.S. at 307, 39 S.Ct. at 468).

Judge Moore of this Circuit, after tracing the history of the qualification of the *Colgate* doctrine announced by the Supreme Court, said in George W. Warner & Co. v. Black and Decker Mfg. Co., 277 F.2d 787, 790 (2d Cir. 1960):

"The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise. The right to impose its will upon distributors and retailers 'is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right "freely to exercise his own independent discretion as to the parties with whom he will deal." ' " (citation omitted)

The Supreme Court, in United States v. Parke, Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960) concluded that an unlawful combination need not be expressly stated:

"Thus, whatever uncertainty previously existed as to the scope of the *Colgate* doctrine, Bausch & Lomb [321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944)] and *Beech-Nut* [257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922)] plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. In other words, an unlawful combination is not just such as arises from a price maintenance *agreement*, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." (emphasis in original).

*See also* Justice Harlan's dissenting opinion. *Id.* at 51, 80 S.Ct. 503.

While this court cannot say upon the evidence adduced under the exigent circumstances of a preliminary injunction hearing that Services has a clear likelihood of success upon a plenary trial of this action it is of the opinion that sufficient serious questions of law and fact have been raised on the merits making them fair ground for litigation.

Chronologically those questions of fact which are presently apparent are:

1. The original contract between the parties (Richray Distributing Co.) and Hartz was entered into in 1963. Paragraph 2 of that contract contained no specification of territory of primary responsibility. This section was altered parenthetically by a new contract in 1969 although the old contract had been in existence for six years, was automatically renewable annually and presumably could have remained in effect. Paragraph 8 was also amended to include what might be said to be exculpatory matter. What occasioned the change? Was it a real change in policy or was it window dressing to camouflage the continuing course of conduct between the parties? Was it done to conform to the Schwinn judgment, United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856 (1967) or does it fall within the category of cases like Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 471 F. 2d 894 (5th Cir. 1973) where area of responsibility was substituted for a restrictive territorial provision but the parties continued to act under the restriction?

2. After eleven years of relationship between the parties what occasioned the seemingly precipitous termination of the contract after one personal confrontation and three telephone calls over a space of only 6 days? The testimony indicates that Hartz claims it terminated because Services would no longer

"rack job" their displays. Services claims that the rack jobbing of Hartz displays and reduced services was never discussed. Instead, the discussion centered on Services's intention to do cost plus wholesaling throughout the Northeast, an area in which it had not until fairly recently sold Hartz products.

3. What was the true nature of the new program initiated by services in September 1974? The testimony of the president of Services denies that its intent was to eliminate service. The evidence thus far shows that over $600,000 has been deposited by Services's customers and that all have taken full service under that program. Hartz was not aware of this when it terminated the contract. The economic impact upon Hartz of this program is in issue. It has not been fully nor satisfactorily explained in the record by either party.

4. Was Hartz at liberty upon termination to inform Services's customers that a) it had terminated Services and b) Services's customers would be supplied with Hartz products by other designated distributors?

5. There is also a claim made by the plaintiff here that there is not only a vertical restraint but also a horizontal restraint and one or both of these issues are open for proof upon a plenary trial.

All of these issues are sharply in dispute.

IRREPARABLE INJURY

█ The court is convinced upon the evidence adduced at the hearing that Services is now in a posture where it has lost one customer, (Peoples Drug) has been cut off from Hartz products and will be unable to supply its remaining customers, and will in all probability lose those customers as Hartz accounts. It is also persuaded that it will take some time to make arrangements to switch to either Sargeants's or any other supplier of pet products, if, in fact, customers would be willing to take another brand of pet supplies. The testimony showed that the gross annual sales

of Hartz products by Services was $1,200,000, at least two thirds of which was concentrated in the Washington, D. C. area in three customers, Peoples Drugs, Dart Drugs, and Grand Union.

Although, as Hartz argues, the lost sales to the old customers may be calculated, there are other factors which must be considered. The fact that Services may lose the Hartz line could possibly lead to the termination of Services by the retailers—such as Grand Union —in other lines of non-food items. This would especially be true if Services can establish the strong brand loyalty to Hartz, and the importance of offering Hartz along with the other non-food items. In addition, damages due to lost sales to new customers cannot be calculated because it would be impossible to calculate either how many stores would not take the new program because Hartz was not available, or the amount of orders that would be placed with Services both for Hartz products, and for other non-food lines.

More importantly, there exists the distinct possibility that Services's business reputation and good will may be irreparably harmed. Some customers have already been informed by Hartz of Services's termination. Services will not be able to fill the orders of other customers because its inventories of Hartz products have been drastically reduced by Hartz's refusal to fill Services's orders. As a result, Services's reputation in the industry as a dependable distributor which offers a full line of non-food items is in jeopardy.

In Interphoto Corp. v. Minolta Corp., 417 F.2d 621, 622 (2d Cir. 1969), affirming 295 F.Supp. 711 (S.D.N.Y. 1969), the court in an antitrust action similar to this case, held:

"With respect to irreparable injury, while the judge was not obliged to accept plaintiff's contention that it would be unable to calculate its damages since it would suffer not merely loss of profits with respect to Minolta's goods but loss of good will from

the loss of a 'full line,' he was free to do so . . . .

The District Court in the Interphoto case concluded that:

"[If the customers go elsewhere,] it would be impossible to estimate or compute Interphoto's damages for the loss of good will it will suffer as a result of being unable to provide its retail customers with Minolta's products."

295 F.Supp. at 724. *See also,* Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970) (Friendly, J).

This court is persuaded that Services has met its burden in showing irreparable harm.

## BALANCING THE EQUITIES

■ Hartz claims that the essence of its business is servicing the racks in the mass merchandising outlets and that a failure to service with trained personnel will ruin its business. It cites two examples in the Northeast area where services were discontinued—Acme Markets and Stop and Shop—the result being a drop in sales of 40 to 60%. Acme was serviced directly by Hartz. The anticipated loss of business as the result of Services's New Program will, it is claimed, also affect other service distributors who will either not service or not properly service Hartz.

These claims might very well be valid if the evidence at the hearing sustained the claim that Services would not perform full services for its customers. The evidence to date does not sustain that claim nor does it sustain the claim that Services would not use its best efforts.

Services, after a year of study, embarked upon a new plan of merchandising which it believed would increase its gross sales from 40 million dollars to 50 million dollars annually. The termination of the Hartz contract requires it to make a contact and develop a relationship with a new supplier of pet items. Whether a supplier with as complete a line or acceptable to its present customers can be found is a question which only time and experience can answer. In the meantime it is faced with the loss of its three major D.C. customers to whom it has sold by estimation at least $800,000 worth of Hartz products in 1973.

Hartz undertook to disparage the program of Services in the first instance by indicating to Services's customers that it would no longer permit Services to provide Hartz products and, in the second instance by directly contacting and trying to discourage a customer who was involved in a pilot project in a store in Yonkers to test out the new program of services. The possibility of damage to Services's business reputation and good will, as previously discussed, is serious and imminent.

Under the circumstances it is the judgment of this court that the equities are tipped in Services's favor.

The court is not unmindful of the admonition of Judge Bonsal in Deltown Foods, Inc. v. Tropicana Products, Inc., 219 F.Supp. 887, 891, 892 (S.D.N.Y. 1963):

"The Court should hesitate before granting a preliminary injunction which would require 'defendants to indefinitely entrust the marketing of their product in a wide area to a distributor with whom a relationship of confidence and cooperation has become impossible'."

Nor is it unaware of the impact of House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962).

In the former case the refusal to deal was evoked by the plaintiff's distribution of its own orange juice in competition with its suppliers and in the latter the contract was cancelled under a voluntary cancellation clause even though motivated by a treble damage action brought by plaintiff.

While defendant here has attempted to bring itself within those two cases the initial evidence indicates that we have a different case here. Certainly it

is hardly credible that it became impossible to have a confident and cooperative relationship with Services in six days after doing business with Services, who admittedly had been no worse than any other distributor, over a period of eleven years.

A preliminary injunction will issue as follows:

Enjoining Hartz Mountain Corp., its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise from:

1. terminating Supermarket Services, Inc. as a distributor of Hartz products;

2. failing to fill in the normal course of business and in normal amounts orders received from Supermarket Services, Inc. for Hartz products under customary credit terms:

3. imposing territorial or customer restrictions on Supermarket Services, Inc. in the distribution of Hartz products;

4. coercing, suggesting or communicating with known customers or potential customers of Supermarket Services, Inc. with respect to such customers refusing to buy from or deal with Supermarket Services, Inc. or the availability of Supermarket Services, Inc. to supply Hartz products.

A preliminary injunction shall also issue as follows:

Enjoining Supermarket Services, Inc., its officers, agents, servants, employees and attorneys and those persons in active concert with them who receive actual notice by personal service or otherwise from:

1. failing to give full service to all customers to whom it presently furnishes Hartz products and who received such service prior to September 6, 1974;

2. failing to give full service to all customers to whom it is now furnishing Hartz products and who were acquired after September 6, 1974 and all new customers to whom it will furnish Hartz products and who will be acquired *pendente lite*.

No bond or other security to secure compliance and damages shall be required of plaintiff or defendant.

So ordered.