**REUTERS LIMITED, Plaintiff–Appellee,**

v.

**UNITED PRESS INTERNATIONAL, INC., Defendant–Appellant.**

No. 1391, Docket 90–7276.

United States Court of Appeals,
Second Circuit.

Argued April 18, 1990.

Decided May 17, 1990.

Mitchell A. Karlan, New York City (Randy M. Mastro, Roger C. Goodspeed, Gibson, Dunn & Crutcher, New York City, of counsel), for defendant-appellant.

Robert G. Sugarman, New York City (Evie C. Goldstein, Patrick DeAlmeida, Gerald Padian, Weil, Gotshal & Manges, New

York City, of counsel), for plaintiff-appellee.

Before MESKILL, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

United Press International (UPI) is one of a handful of major wire services that sells foreign and domestic news and photographs to subscribing newspapers and magazines. As a result of financial problems it sold to Reuters Limited (Reuters), another major wire service company, its foreign newspicture service. Reuters agreed in turn to furnish such newspictures to UPI for the latter to supply to its subscribers. This litigation began when Reuters terminated this service to UPI. UPI moved in the Southern District of New York (Leisure, J.) to obtain a preliminary injunction ordering Reuters to continue the foreign newspicture service pending final judgment of the underlying litigation over a contract that establishes the parties' rights to receive news photographs from each other. Upon denial of its motion for a preliminary injunction, UPI appeals.

## BACKGROUND

UPI and Reuters are news gathering organizations that market and sell both written stories and newspictures to their subscribers, which are primarily newspapers and news magazines. Because these companies and similar organizations gather and transmit their products electronically—often utilizing telephone lines—they have been dubbed "wire services." UPI, based in the United States, historically has been considered, along with the Associated Press (AP), one of the two major American wire services. Other than the AP, UPI has had few competitors providing the U.S. print media with national and international news and photographs. Recently Reuters, a British wire service, has given UPI increased competition.

The relevant dealings between the parties began in 1984. Until then UPI had foreign bureaus gathering news and photographs of international events for distribution to its approximately 150 subscribers. It experienced financial difficulties in the early 1980s that prompted it to sell its foreign newspicture service to Reuters, which at that time had no newspicture production capacity. Although UPI sold its foreign newspicture service, it retained its foreign news reporting service and its domestic reporting and newspicture services. A correlate contract was formed at the time of the sale of the foreign newspicture service. Under it the parties agreed to supply each other with newspictures—Reuters providing UPI with foreign photographs, gathered through a world-wide network of staff and free lance photographers, for UPI to sell to its U.S. subscribers, and UPI providing Reuters with United States photographs for Reuters to distribute outside the United States. This exchange was documented in a Picture Service Agreement (Agreement) dated June 25, 1984—effective January 1, 1985—and was to remain in force for ten years.

The Agreement requires UPI and Reuters to provide each other with newspictures in "the same in volume and quality as supplied by UPI to its US and international newspicture subscribers" as of June 25, 1984. It also expressly permits Reuters to market and sell in the U.S. its full newspicture service—including photographs not chosen by UPI—providing that it reimburse UPI for lost profits resulting from the termination of contracts by UPI's subscribers who elect to purchase "the full and unedited Reuters Service" in the United States. Disagreements between the parties regarding such reimbursement were to be resolved through arbitration.

Despite its ten-year term, the Agreement was terminable by either party in the event that

default shall be made in the due observance or performance of any provision on the part of either party hereto to be observed or performed under any of the UPI/Reuters Agreements and such default shall continue for 10 days after notice to the defaulting party.

In the face of such a continuing default, at any time thereafter during the continuance of such [default], the party not in

default may ... terminate this Agreement, [and] ... exercise any other rights at law or in equity, including the right to a decree of specific performance which remedy both parties hereby agree is an appropriate remedy.

The parties had many disputes in the several years following Reuters' purchase of UPI's foreign newspicture service. UPI's finances worsened, leading it to file for bankruptcy in 1985, from which it is emerging. Its finances would appear now to be on a more solid financial footing. Reuters' internal memoranda reflect its concern regarding UPI's financial stability and its concern that UPI might be unable to provide Reuters with continuing newspicture coverage in the United States. Letters sent by both parties reveal that one party was often displeased with the other's coverage of specific news events, and UPI complained to Reuters that the latter's sales of its service in the U.S. had cost UPI subscribers for which it had not received reimbursement. As a result of increased tensions arising from its suspicions about Reuters' inroads into the U.S. market, UPI negotiated in 1989 with Agence France Presse (France Presse), a French wire service and the only other organization capable and willing to provide UPI with foreign newspicture service. These negotiations led to France Presse committing itself to provide UPI with foreign newspictures for a three-month period in the event that Reuters stopped its service. Although there is no indication that the French wire service company would be unwilling to extend its three-month commitment, so far it has refused to commit itself for any further period.

In early 1989 the already strained relations between the parties deteriorated further. UPI asked Reuters on January 17 for reimbursement for lost revenues allegedly caused by Reuters' sales of its foreign picture service to UPI subscribers. Reuters responded in a letter dated January 30 that UPI had fallen short of its obligation to provide pictures of the same quality and volume as it had supplied as of June 25, 1984. This initial letter made no mention of terminating the Agreement, nor of the words "default" or "notice." But Reuters' subsequent March 22, 1989 letter referred to the written notice to UPI in its letter of January 30, 1989 that claimed UPI was in default of its obligations under Section 1.1 of the Agreement, and stated that UPI had not cured the defects.

Throughout the remainder of 1989 each of the parties asserted that the other had violated the Agreement. At the same time they continued to provide each other with photographs. In January 1990 UPI advised Reuters that without reimbursement for lost subscribers it would commence arbitration proceedings to recover its damages. On February 16, 1990 Reuters informed UPI that it was ceasing transmission of foreign news photographs and terminating the Agreement, basing its right to do so on the continuing default noted in its letters of January 30 and March 22, 1989.

After Reuters stopped transmitting photographs for approximately ten hours on February 16 the parties agreed that Reuters would resume transmissions until March 2 to allow UPI to seek judicial relief. On February 27 Judge Leisure entered a temporary restraining order (TRO) requiring Reuters to continue transmissions until a hearing could be held on UPI's request for a preliminary injunction. After the hearing held on March 12 the district court denied UPI's motion, finding that it had failed to establish a likelihood of irreparable harm. The district judge observed that the threatened irreparable injury which UPI alleged consisted of an immediate loss of customers who would not accept a substitution of Reuters' photographs by France Presse and the possible loss of all of UPI's newspicture subscribers if—after the expiration of three months—UPI is unable to extend its arrangement with France Presse. Because the district court believed the first irreparable injury claim to be compensable in money damages and the second claim to be speculative, it concluded that UPI had failed to establish irreparable harm.

UPI appealed and on March 15, 1990 moved in this Court for a stay and an

expedited appeal. On March 20 UPI's motion was granted. During oral argument of the expedited appeal the stay was extended pending this decision. We now reverse.

## DISCUSSION

### I   *Requirements for Issuance of a Preliminary Injunction*

It is well established in this Circuit that a party seeking a preliminary injunction must show that it is likely to suffer possible irreparable injury if the injunction is not granted and "either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982). *See also, Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989); *Video Trip Corp. v. Lightning Video, Inc.,* 866 F.2d 50, 52 (2d Cir.1989); *New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755–56 (2d Cir.1977).

■ Because a showing of probable irreparable harm is " 'the single most important prerequisite for the issuance of a preliminary injunction,' " *Bell & Howell: Mamiya Co. v. Masel Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2948, at 431 (1973)), the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, *Tucker,* 888 F.2d at 975, and the alleged injury must be one incapable of being fully remedied by monetary damages. *Id.; Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir. 1986).

### II   *Appellate Review*

■ Whether a preliminary injunction should issue or not rests in the discretion of the district court which, absent an abuse

of discretion, will not be disturbed on appeal. *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 755, 106 S.Ct. 2169, 2175–76, 90 L.Ed.2d 779 (1986); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 973–74 (2d Cir.1987). An abuse of discretion exists when the district court has made an error of law or of fact. *Coca–Cola,* 690 F.2d at 315, 317–18 (erroneous conclusion of fact); *see also United States v. Corrick,* 298 U.S. 435, 438, 56 S.Ct. 829, 830–31, 80 L.Ed. 1263 (1936) (error of law); *Parents' Ass'n of P.S. 16 v. Quinones,* 803 F.2d 1235, 1239 (2d Cir.1986) (error of law). *But cf. Stormy Clime,* 809 F.2d at 974 (distinguishing abuse of discretion from error of law). In analyzing what the term "abuse of discretion" means, we have observed that when "reviewing the action of a trial court, an appellate court is not limited to reversing only when the lower court's action exceeds any reasonable bounds and to rubber-stamping with the imprimatur of an affirmance when it does not." *Coca–Cola,* 690 F.2d at 315. A trial court's discretion is exceeded "when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts." *Stormy Clime,* 809 F.2d at 974.

Upon applying these standards, we believe that the district court abused its discretion when it denied UPI's motion for a preliminary injunction.

### III   *Irreparable Harm*

In denying UPI's motion, the trial court relied heavily on the commitment made by France Presse to supply UPI with foreign newspictures for three months. Judge Leisure found that while the French wire service had refused to agree to any longer commitment, it might agree to do so later and hence he concluded that UPI had shown no imminent irreparable injury.

A key argument raised by UPI—one not discussed by the district court—is that terminating the delivery of a unique product to a distributor whose customers expect

and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor. *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir.1977) (threatened loss of customers and good will from manufacturer's termination of supply of a brand of products to distributor posed irreparable injury); *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711, 723–24 (S.D.N.Y.) ("it would be impossible to estimate or compute [movant's] damages for the loss of good will it will suffer as a result of being unable to provide its retail customers with [opponent's] products."), *aff'd*, 417 F.2d 621 (2d Cir.1969) (per curiam). *See also Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 728 (3rd Cir.1962); *Supermarket Services, Inc. v. Hartz Mountain Corp.*, 382 F.Supp. 1248, 1256–57 (S.D.N.Y.1974). This is particularly evident when many of the distributor's customers have indicated not only a strong preference for the terminated product, but also have threatened to stop dealing with the distributor if it cannot continue to supply that product.

■ News and pictures are the lifeblood of the wire service industry so that interrupting the flow of pictures even briefly threatens a wire service company's continued viability. Each picture tells a story and carries a reminder of the truth contained in the old adage that weighs one picture against a thousand words. Hence, it comes as no surprise that UPI presented uncontested evidence that many of its customers are troubled by the prospect of losing Reuters' photographs. Two of UPI's executives testified at depositions that some customers will cancel their subscriptions if it is unable to provide Reuters photographs *regardless* of whether UPI replaces Reuters with France Presse. This evidence was further bolstered by a survey made by UPI of 36 out of its approximately 150 subscribers, in which some of those surveyed indicated that they would immediately drop their subscription if UPI became unable to provide Reuters photographs. The district court adopted as a finding of fact that it is "likely that some UPI customers may not be content with the re-

placement of Reuters by France Presse, and may choose to disconnect UPI."

■ Moreover, uncontested testimony by UPI officials establishes that if UPI is unable to extend its arrangement with France Presse after expiration of the initial three month commitment, UPI will have no other source of foreign newspictures, and it therefore might well lose most of its newspicture service subscribers. At oral argument Reuters conceded this point, stating that if UPI is unable to extend the France Presse arrangement UPI would likely suffer irreparable harm. Because there was no evidence before the trial court that the French wire service company would refuse to continue to supply photographs, the district court considered this possibility speculative.

We agree that the actual loss of France Presse's services is not imminent. Yet even a speculative loss may cause immediate irreparable harm to UPI's good will. It is self-evident that newspapers that are furnished with stories and photographs by wire service rely on the services' continuing dependability. As demonstrated by recent happenings in Eastern Europe, history-making events occur as quickly as a blink of the public's eye, and interruption however short the time in a newspaper's coverage of the news causes it to lose readership. So a newspaper is naturally at risk when its source of foreign photographs is only guaranteed for three months. We cannot imagine that UPI's reputation and good will in the news industry would not be injured by such an announcement. Further, an injury of this sort is nearly impossible to value. *See Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338, 348 (E.D.Pa. 1988); *Supermarket Services*, 382 F.Supp. at 1256–57.

The denial of the preliminary injunction was also premised on the notion that UPI could show no more than an immediate loss of some but not most of its customers, and that a loss of customers is compensable by monetary damages. We leave aside the catch–22 implication of requiring a movant

seeking a preliminary injunction to produce evidence to support its claim of irreparable harm that its present customers will cease subscribing if foreign pictures are no longer furnished to it. Alerting UPI's subscribers to the tentative nature of the foreign newsphoto service could well lead to cancellation of their subscriptions thereby creating the irreparable harm the movant is attempting to demonstrate. Again, in cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product. *See, e.g., Jacobson,* 548 F.2d at 444–45; *Supermarket Services,* 382 F.Supp. at 1256; *Interphoto,* 295 F.Supp. at 723–24. *Cf. John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 29 (2d Cir.1978) (irreparable injury shown when "plaintiff is deprived totally of the opportunity to sell an entire line of merchandise and may incur injury to its goodwill and reputation 'as a dependable distributor'" (quoting *Supermarket Services,* 382 F.Supp. at 1256)), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). We are persuaded that similar irreparable injury to UPI incalculable in dollars and cents will likely occur were UPI suddenly to be unable to supply Reuters foreign news photographs to its subscribers.

While UPI's subscribers may still be aware of the prospect that UPI will eventually lose Reuters' service, depending on the outcome of the underlying litigation, allowing UPI to continue to distribute Reuters photographs *pendente lite* will calm the concerns of many subscribers who will have the security of knowing that UPI's supply of foreign newspictures will not suddenly run dry. Thus, the issuance of a preliminary injunction is necessary to maintain the *status quo* until a full trial is had.

The district court did not reach the second prong of the test, that is, either a likelihood of success on the merits or sufficiently serious questions going to the merits making them a firm ground for litiga-

tion and a balance of hardships in its favor. *Video Trip Corp.,* 866 F.2d at 52. The record demonstrates that UPI has sufficiently shown serious questions going to the merits and a balance of hardships in its favor to satisfy this second prong.

One issue raised is whether UPI has breached the Agreement by failing to supply Reuters with newspictures from the United States in the same volume and of the same quality as those it supplied to its subscribers on June 25, 1984. Since this contention appears to be the sole justification for Reuters' termination of the Agreement, its determination in UPI's favor would require judgment for UPI. Moreover, after examining the affidavits and deposition testimony submitted by UPI on the issue of whether its supply of photographs has fallen below the quality of those furnished on June 25, 1984, UPI has presented enough evidence to create a substantial issue of fact requiring the scrutiny only a trial could afford. Hence, there is at least one issue of sufficient importance going to the merits to create a firm ground for litigation.

■ As for the last element of the second prong—a balance of hardships in the movant's favor—certainly UPI's irreparable harm discussed earlier outweighs any harm that Reuters might suffer as a result of a preliminary injunction issuing against it. Reuters need do only what it has done for the past five years—provide UPI with newspictures. The hardship, if any, for Reuters that may result from continuing its relationship under the agreement pending the outcome of the litigation is, on the basis of the record, insignificant in comparison to the hardships that UPI faces absent a preliminary injunction.

## CONCLUSION

We believe the district court exceeded its discretion when it concluded that UPI would not suffer immediate irreparable harm were the preliminary injunction denied. UPI also presented sufficient evidence to show serious questions going to the merits of the suit and a balance of

**910**

hardships in its favor. Therefore, the order appealed from is reversed and the matter remanded to the district court with directions to issue the preliminary injunction and thereafter to proceed to a trial on the merits.

Reversed and remanded.