Clarence **MITCHELL** and Aischa **Mitchell**, Plaintiffs,

v.

**CENTURY 21 RUSTIC REALTY, Sheila Shane, Harvey Shane and Matthew Ryan, Defendants.**

No. 01–CV–1162(TCP)(WDW).

United States District Court, E.D. New York.

April 29, 2002.

---

Stephen T. Mitchell, New York City, for Plaintiffs.

Stephen J. Penino, Penino & Moynihan, LLP, White Plains, NY, for Century 21 Rustic Realty.

Neil J. Moritt, Moritt, Hock, Hamroff & Horowitz, Garden City, NY, for Sheila and Harvey Shane.

Thalia Feilen, Goldson/Nolan Associates, LLP, Melville, NY, for Matthew Ryan.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before the Court are objections by Plaintiffs Clarence and Aischa Mitchell ("Mitchells") to a Report and Recommendation issued by United States Magistrate Judge William D. Wall recommending that this Court deny the Mitchells' Motion for a Preliminary Injunction. For the following reasons, the Court OVERRULES the Mitchells' objections, ADOPTS Magistrate Judge Wall's Report and Recommendation as an order of this Court, DENIES the Mitchells' Motion for a Preliminary Injunction and AFFIRMS Magistrate Judge Wall's denial of their discovery request.

## BACKGROUND

While Magistrate Judge Wall's Report and Recommendation relates the entire factual background of this case, the Court believes it necessary to restate that factual background in order to properly address the Mitchells' objections. Familiarity with Magistrate Judge Wall's Report and Recommendation, however, is presumed.

### A. The Parties

Plaintiffs Clarence and Aischa Mitchell are an African American couple. (R. at 151:19, 293:03.) Clarence Mitchell is a partner with Andersen Consulting spin-off Accenture. (R. at 151:01–05.) Aischa Mitchell is a fashion model with Wilhelmena Models, Incorporated. (R. at 151:13–14.) The Mitchells reside in New York, New York. (Defs.' Evidentiary Hearing Ex 1.) Marie Ongioni ("Ongioni") is the Mitchells' real estate attorney. (R. at 161:22–23;

246:17–18, 247:15–22, 303:03–04; Defs.' Evidentiary Hearing Ex 2.)

Defendants Sheila and Harvey Shane ("Shanes") are the owners of real property located at 2548 Deerfield Road in Southampton, New York ("Property").[1] (R. at 92:01, 07; Defs.' Evidentiary Hearing Ex. 2.) The Shanes currently, and did at all relevant times, reside in Florida. (R. at 94:01–03, 105:13; Defs.' Evidentiary Hearing Ex. 2.) Kara Bak ("Bak") is the Shanes' real estate attorney. (R. at 12:18–19; 23:19–22, 25:24–26:01, 303:03; Defs.' Evidentiary Hearing Ex 2.)

Defendant Century 21 Rustic Realty ("Century 21") is the listing broker for the Property. (R. at 91:21, 92:12–13; Defs.' Evidentiary Hearing Ex. 2.) Defendant Matthew J. Ryan ("Ryan") is employed by Century 21 and is the listing agent for the Property. (R. at 91:21–23; Defs.' Evidentiary Hearing Ex. 2.) Ryan held an open listing on the Property for Century 21 in August of 2000 but eventually became the Shanes' exclusive agent in the Fall of 2001. (R. at 92:12–13, 94:18, 296:12–18.)

Robin Kaplan ("Kaplan") is the selling broker for the Property and was one of the people with whom the Mitchells communicated when they began searching for homes in eastern Long Island.[2] (R. at 292:23, 296:10–23; Defs.' Evidentiary Hearing Ex 2.) Kaplan was employed by Allen M. Schneider Associates, Incorporated ("Schneider Associates"). (Defs.' Evidentiary Hearing Ex. 1; Pl.'s Evidentiary Hearing Ex. W.)

Michael Selleck ("Selleck") successfully bid on the Property and is the contract vendee of the Property. (R. at 7:07–14, 16:11–17.) Selleck has not yet closed on the Property.

## B. The Mitchells' Attempts to Purchase the Property

On May 4, 2001, the Mitchells communicated with Kaplan at Schneider Associates and requested assistance in finding a home to purchase in eastern Long Island. (R. at 292:23–24.) Two days later, on May 6, 2001, Kaplan met with the Mitchells for the first time. (R. at 293:01.) Several months later, in late November or early December of 2001, Kaplan showed the Mitchells the Property. (R. at 151:21–25.)

Subsequent to viewing the Property for the first time with Kaplan, the Mitchells returned with an architect and discussed whether changes could be made to the Property. (R. at 152:22–24, 153:02–04). In early to mid December of 2001, after learning that their proposed changes could be made, the Mitchells offered the Shanes $655,000.00 through Kaplan for the Property. (R. at 153:02–04, 11–13, 16.) The Mitchells then went on holiday with that offer outstanding. (R. at 153:16–17.)

On December 26, 2001, Kaplan called the Mitchells in San Jose, California. (R. at 154:02–05.) Kaplan notified the Mitchells that another prospective purchaser had offered $672,000.00 for the Property. (R. at 154:02–05.)

In order to demonstrate their resolve and genuine desire to purchase the Property, the Mitchells authorized Kaplan that same day to offer $685,000.00 for the Property. (R. at 154:14–15, 308:12–18.) On December 26, 2001, Kaplan faxed the following to Ryan:

Dear Matthew—

Mr. and Mrs. Clarence Mitchell of 331 West 84th St. NYC. have asked me to

---

1. Sheila Shane is the record owner of the Property. (R. at 92:07.)

2. Kaplan was technically the Shanes' subagent and was employed under a co-broker-

ing agreement to "get the highest and best price" for the Shanes. (R. at 296:20–23.) Accordingly, she was not retained by the Mitchells as their broker. (R. at 296:10–13.)

proffer an offer of $685,000 to M/M Harvey Shane. This is subject to engineer's report and 80% financing. They are able to close on or about March 1, 2002. (Defs.' Evidentiary Hearing Ex. 1; R. at 295:09–23, 297:25–298:01–05.)

The Mitchells contend they were unaware that their initial offer contained an 80% mortgage financing contingency. (R. at 184:04–17.) Clarence Mitchell testified that he only authorized Kaplan to offer the Shanes $685,000.00 for the Property with the standard contingencies, but that he did not discuss what those standard contingencies were.[3] (R. at 184:23–185:01.)

The Shanes expressed interest in the Mitchells' December 26, 2001 offer. (R. at 112:13–14.) However, the Shanes wanted proof that the Mitchells could consummate the sale before formally accepting their offer. (R. at 154:22–25.)

Accordingly, while still away on holiday, the Mitchells authorized a person in their cooperative in New York City to run a credit check on them. (R. at 155:04–07.) On December 27, 2001, the Mitchells were preapproved by the Manhattan Mortgage Company ("Manhattan Mortgage") for a mortgage of $616,500.00, which represents approximately 90% of the $685,000.00 purchase price agreed to by the Shanes and Mitchells. (R. at 155:08–11, 294:11–16, 295:07–08, 25, 297:18–20.) Manhattan Mortgage's preapproval letter was sent to Kaplan, Ryan and Ryan's manager. (R. at 294:11–12, 25, 295:01–03.) Ryan forwarded a copy of that preapproval letter to the Shanes as well. (R. at 112:17–19.)

The Shanes took immediate issue with the 90% financing contained Manhattan

Mortgage's preapproval letter. (R. at 112:24–113:02.) They told Ryan they were concerned that 90% financing would not inject enough equity into the Property and that it would defeat a "smooth[ ] transition." (R. at 113:01–02.)

Accordingly, Ryan contacted Kaplan and relayed the Shanes' dissatisfaction with the 90% mortgage contingency. (R. at 113:14–17.) Kaplan told Ryan that the Mitchells would obtain 80% mortgage financing. (R. at 113:18–20.) Ryan consequently agreed to issue a memorandum of sale based on the terms of the Mitchells' December 26, 2001 offer which included an 80% mortgage contingency clause. (R. at 113:21–23.)

On December 29, 2001, Ryan prepared that memorandum of sale. (Defs. Evidentiary Hearing Ex. 2.) Ryan's memorandum of sale listed a $685,000.00 purchase price and stated that the sale was subject to both 80% "Bank Financing" and an engineer's report.[4] (Defs. Evidentiary Hearing Ex. 2.) Ryan sent copies of his memorandum of sale to Ongioni, Kaplan, Bak and the Shanes. (R. at 113:23–24.)

Kaplan had also previously prepared her own memorandum of sale on December 27, 2001.[5] (R. at 312:05–12; Defs. Evidentiary Hearing Ex. 18.) Kaplan's first memorandum of sale indicated that the purchase agreement was "[s]ubject to ... 80% financing." (Defs. Evidentiary Hearing Ex. 18.) It is not clear if Kaplan ever disseminated her first memorandum of sale to anyone.

At the Evidentiary Hearing conducted before Magistrate Judge Wall, Kaplan pro-

---

**3.** Ryan did not ask Kaplan to include an 80% mortgage contingency clause in the Mitchells' offer either. (R. at 113:05–09.)

**4.** Ryan's memorandum of sale also stated that the closing would occur on or about February 15, 2002. (Defs. Evidentiary Hearing Ex. 2.)

**5.** That memorandum of sale was in fact produced by Kaplan's assistant, Jan Jaeger. (R. at 338:02–05.)

duced a second memorandum of sale that she appears to have authored on December 29, 2001. (R. at 298:15–24, 299:19–22.) That second memorandum of sale stated that the purchase agreement was subject only to production of a satisfactory engineer's report. (Pl.'s Evidentiary Hearing Ex. W.) It further stated that $615,000.00 preapproved mortgage financing was a term of the deal. (Pl.'s Evidentiary Hearing Ex. W.) Accordingly, the 80% mortgage contingency clause was not contained in Kaplan's second December 29, 2001 memorandum of sale. (R. at 314:18–20.) Kaplan apparently faxed that second memorandum of sale to Bak, Ongioni and Ryan the same day it was authored. (R. at 303:03–09, 310:06–13.)

On January 3, 2002, Bak sent "four duplicate original Contracts of Sale and Riders" for the Property to Ongioni. (Defs.' Evidentiary Hearing Ex. 3.) The cover letter under which those contracts were sent stated that if the contracts were acceptable to the Mitchells, they were to sign and return them with a check for $68,500.00 payable to Bak. (Defs.' Evidentiary Hearing Ex. 3.) That cover letter also stated that "[s]ince this is not to be considered a continuing offer to sell, if the signed contracts are not returned to my office within ten days from your receipt same [sic], then this offer shall be considered terminated without prejudice to either party." [6] (Defs.' Evidentiary Hearing Ex. 3.) Finally, Bak's cover letter directed Ongioni to contact Bak before making any changes to the contracts. (Defs.' Evidentiary Hearing Ex. 3.) Ongioni received that cover letter and the four duplicate contracts on January 4, 2002. (R. at 248:18–19, 249:04.)

On January 5, 2002, the Mitchells had an engineer inspect the Property. (R. at 156:01–06.) The engineer uncovered several problems with the Property during the course of his inspection. (R. at 156:07–08, 13–15, 21–25, 157:01–02, 13–18.) On January 10, 2002 (six days after Ongioni received the contracts), the engineer issued a formal report to the Mitchells that outlined the problems with the Property that he had uncovered. (R. at 158:03–08.) The Mitchells estimated that it would cost approximately $20,000.00 to $25,000.00 to repair those problems. (R. at 158:13–14.)

Following the issuance of the engineer's report, Ongioni contacted Bak to discuss semantic changes to be made to the contracts and the results of the engineer's report. (R. at 249:05–250:01.) In the meantime, the Mitchells contacted Kaplan. (R. at 158:15–18.) The Mitchells directed Kaplan to demand an $8,000.00 to $10,000.00 purchase price reduction from the Shanes as a compromise for the results of the engineer's report. (R. at 158:15–24.)

Kaplan subsequently called Ryan and relayed the Mitchells' request for an $8,000.00 to $10,000.00 purchase price reduction. (R. at 104:01–16.) On January 14, 2002 (ten days after Ongioni received the contracts), Ryan called the Shanes to discuss the Mitchells' price reduction request. (R. at 103:18, 104:20.)

The Shanes were not pleased with that request. (R. at 104:21–105:08.) Mr. Shane initially told Ryan he would not entertain that request and declined to renegotiate. (R. at 105:06–08.) However, after some coaxing from Ryan, the Shanes agreed to an $8,000.00 purchase price reduction. (R. at 105:09–18.)

The Shanes only agreed to that reduction though, on condition that the Mitchells sign the contracts and have them back in Bak's office by January 16, 2002. (R. at 105:17–21, 158:22–24.) Following more ca-

---

6. It is unclear from the record whether Ongioni ever conveyed the ten day requirement to the Mitchells, but it appears she may not have. (R. at 268:10–269:06.)

joling by Ryan, the Shanes agreed to give the Mitchells until January 17, 2002 to return the signed contracts to Bak. (R. at 105:22–106:05.)

On January 15, 2002 (eleven days after Ongioni received the contracts and two days before they were due back to Bak), Kaplan called Ryan to express the Mitchells' gratitude for holding the deal together and to assure Ryan that Kaplan would personally certify the contracts were in Bak's office by January 17, 2002. (R. at 106:18–107:02.) Shortly thereafter, the Mitchells faxed a signed signature page of the contract to Bak and Kaplan. (R. at 159:12–15.)

On January 18, 2002 (fourteen days after Ongioni received the contracts and one day after the Shanes' deadline expired), the Mitchells drew a certified check for $67,700.00 from Citibank, which represented 10% of the renegotiated $677,000.00 purchase price. (R. at 160:06–12; Defs.' Evidentiary Hearing Ex. 9.) The Mitchells then took the contract and modified it by: (1) crossing out the $685,000.00 purchase price wherever it appeared and replacing it with a $677,000.00 price; and (2) crossing out and replacing the 80% mortgage contingency sum of $548,000.00 with a 90% mortgage contingency sum of $609,300.00. (Def.'s Evidentiary Hearing Ex. 5; R at 32:20–25, 39:23–25, 53:11–13, 123:08–16, 162:09–13, 251:11–18, 259:18–21, 260:05–261:02.) The Mitchells then sent the contracts to Ongioni.[7] (R. at 160:10–11, 161:06–13.)

On January 20, 2002 (sixteen days after Ongioni received the contracts and three days after the Shanes' deadline expired),

Ryan presented an offer from Selleck to the Shanes.[8] (R. at 127:23–24.) Selleck apparently offered the Shanes $685,000.00 for the Property with a mortgage contingency of $285,000.00. (R. at 102:12–17.) The Shanes indicated a preference for that offer, but did not accept it at the time it was made. (R. at 127:24–128:02.)

On January 22, 2002 (eighteen days after Ongioni received the contracts and five days after the Shanes' deadline expired), Selleck presented Ryan with a preapproval letter from his mortgage company, the IPI Skyscraper Mortgage Corporation. (R. at 96:16, 97:08–09, 98:01, 139:23–24.) That same day, Ryan notified the Shanes that he received Selleck's approval letter. (R. at 98:02–04.)

On January 22, 2002, Ongioni also sent the Mitchells' modified signed contracts and $67,700.00 deposit check to Bak by overnight mail. (R. at 250:19–21.) Ongioni did not send the contracts until January 22, 2002 because she had been on vacation the whole previous week, and January 21, 2002 was a legal holiday.[9] (R. at 250:04–20.) Additionally, on January 22, 2002, Ryan notified Bak that Selleck was considering the Property. (R. at 31:22–32:01.)

On January 23, 2002 (nineteen days after Ongioni received the contracts and six days after the Shanes' deadline expired), Ryan called Bak. (R. at 32:11–14.) In that call, Ryan told Bak that the Shanes had decided to consummate the Mitchells' deal and that Bak should go through with that deal. (R. at 32:11–14.)

---

7. Ongioni, who was on vacation from January 11, 2002 until January 22, 2002, was away when the contracts were sent to her. (R. at 250:04–25, 269:18–19.)

8. Ryan continued to entertain bids on the Property because no one had fully contracted to buy it yet. (R. at 98:05–14.)

9. Ongioni had previously told Bak that she would be unable to send the contracts until January 22, 2002 because of her vacation, and Bak apparently did not object. (R. at 250:22–251:07.)

On January 23, 2002, Bak also received the Mitchells' contracts and deposit check. (R. at 42:01–07, 251:11–12.) Bak called Ongioni that same day and noted that the mortgage contingency clause in the contracts had been changed from 80% to 90%.[10] (R. at 32:20–25, 167:15–17, 251:11–14.) Ongioni asked Bak to contact her if the Shanes found the change to the mortgage contingency clause unacceptable, but it is not clear that Bak agreed to notify Ongioni of any problem. (R. at 251:17–252:01.)

Apparently, after receiving Selleck's $685,000.00 offer, and after receiving the Mitchells' modified contracts, the Shanes contacted Bak to inquire if they were bound to the Mitchells' deal. (R. at 69:13–18.) Specifically, the Shanes wished to know if the Mitchells had been given any specific time period within which to return the signed contracts and whether or not they could legally proceed with the Selleck deal. (R. at 69:15–18, 21–23.)

On January 24, 2002, Ryan issued an offer and acceptance to Selleck. (R. at 128:02, 128:13–14.) Offers and acceptances are non-binding verbal agreements among buyers and sellers indicating that the parties have reached favorable terms. (R. at 127:15–17, 131:11–14.)

On January 24, 2002, Bak sent contracts for the sale of the Property to Selleck's attorney, Arthur Elfenbein. (R. at 25:21–25.) On January 25, 2002, Selleck returned his signed contracts to Bak with a deposit check for $68,500.00. (Defs.' Evidentiary Hearing Ex. 6.) On January 28, 2002, Bak forwarded the signed Selleck contracts to the Shanes. (Defs.' Evidentiary Hearing Ex. 7.)

On January 29, 2002, after receiving the contracts signed by Selleck and Selleck's $68,500.00 deposit check, Bak wrote to Ongioni and returned the Mitchells'$67,700.00 deposit check ("January 29th Letter"). (Defs.' Evidentiary Hearing Ex. 9.) Bak notified Ongioni in that letter that the Shanes had rejected the Mitchells' 90% mortgage financing offer. (Defs.' Evidentiary Hearing Ex. 9.)

On January 30, 2002, before Ongioni received the January 29th Letter, she called Bak to inquire about the status of the Mitchells' contract. (R. at 254:12–13; Defs.' Evidentiary Hearing Ex. 10.) Bak informed Ongioni that she had returned the Mitchells' deposit check the day before. (R. at 254:12–15.) Ongioni expressed surprise that Bak had not called her about the 90% mortgage financing difficulties before rejecting the Mitchells' offer and asserted that it would purportedly have been customary to afford the Mitchells an opportunity to offer 80% financing. (R. at 254.19–255:17; Defs.' Evidentiary Hearing Ex. 10.)

Ongioni also informed Bak that she would call the Mitchells to determine if they could provide that 80% mortgage financing. (R. at 255:23–25.) Ongioni subsequently phoned the Mitchells who agreed to provide 80% mortgage financing. (R. at 256:01–04.)

Ongioni contacted Bak immediately and informed her that the Mitchells intended to secure 80% mortgage financing. (R. at 256:04–10.) Bak indicated that she did not think the Shanes would accept the Mitchells' offer at that point because of the Selleck deal, but stated that she would communicate the offer to the Shanes nonetheless. (Defs.' Evidentiary Hearing Ex. 10.) The Shanes did not accept that offer, because on January 30, 2002, Sheila Shane singed the Selleck contract and thereby

---

10. Ongioni did not learn that the Mitchells had changed the mortgage contingency clause until Bak told her during that phone call. (R. at 253:10–12, 259:21, 260:08, 261:23–25.) Ongioni was surprised to learn that the Mitchells had done so. (R. at 260:10.)

sold the Property to Selleck. (Defs.' Evidentiary Hearing Ex. 8.)

On January 31, 2002, Ongioni called Bak again to see if the Shanes had accepted the Mitchells' 80% financing proposal. (R. at 257:03–13; Defs.' Evidentiary Hearing Ex. 10.) Bak was unavailable however, and Ongioni had to leave a message for her. (R. at 257:05–07; Defs.' Evidentiary Hearing Ex. 10.) Bak did not return Ongioni's call. (R. at 257:16; Defs.' Evidentiary Hearing Ex. 10.)

On February 1, 2002, Ongioni wrote to Bak and reiterated the substance of their January 30, 2002 phone conversation. (Defs.' Evidentiary Hearing Ex. 10.) Ongioni also relayed that her "clients are . . . of the opinion that there may be certain underlying issues which caused . . . [the Shanes] to decide not to sell to . . . [the Mitchells]." (Defs.' Evidentiary Hearing Ex. 10.) Ongioni finally advised Bak that "[i]f this is the case, . . . [the Mitchells] intend to pursue the matter in the appropriate forum." (Defs.' Evidentiary Hearing Ex. 10.)

On February 5, 2002, Bak wrote back to Ongioni to respond to Ongioni's February 1, 2002 letter. (Defs.' Evidentiary Hearing Ex. 11.) Bak wrote that she received the contracts outside the ten day window afforded to the Mitchells by her January 3, 2002 cover letter, and that the contracts contained a change to a material term. (Defs.' Evidentiary Hearing Ex. 11.) Bak concluded that because of those facts, the Shanes "felt that the . . . [Mitchells] were not serious buyers, and moved on." (Defs.' Evidentiary Hearing Ex. 11.)

On February 7, 2002, before she received Bak's February 5, 2002 letter, Ongioni wrote to Bak again. (Defs.' Evidentiary Hearing Ex. 12.) Ongioni informed Bak that the Mitchells believed that "the reason the . . . [Shanes did] not proceed[ ] with the sale to them . . . was discrimination based on race." (Defs.' Evidentiary Hearing Ex. 12.) Ongioni also notified Bak that her "clients are African American" and that they intended to pursue their legal remedies if the Shanes would not sell the Property to them. (Defs.' Evidentiary Hearing Ex. 12.)

Ongioni's February 7, 2002 letter was Bak's first notification that the Mitchells were African American. (R. at 76:22–77:10.) That was also the first time Bak discussed the Mitchells' race with the Shanes. (R. at 77:11–78:05.) Harvey Shane had not been aware that the Mitchells were African American until that discussion because he had never met the Mitchells. (R. at 78:03–05; Defs.' Evidentiary Hearing Ex. 13.)

Ryan knew the Mitchells were African American as early as mid December of 2001 and was certainly aware of their race by January 5, 2002. (R. at 152:22–153:01, 10–11, 155:21–156:06.) However, Ryan never discussed the Mitchells' race with the Shanes until some time after February 1, 2002 when they had already decided to contract with Selleck. (R. at 141:10–17.)

On February 8, 2002, Bak responded to Ongioni's February 2, 2002 letter. (Defs.' Evidentiary Hearing Ex. 13.) Bak stated that the Shanes, who lived in Boca Raton, Florida at the time, had no knowledge of the Mitchells' race until Ongioni disclosed it in her February 7, 2002 letter. (Defs.' Evidentiary Hearing Ex. 13.) Bak also explained to Ongioni that the reason the Shanes had pursued Selleck's deal over the Mitchells' deal was that:

> [the] Shane[s] were merely frustrated that it took almost three weeks for . . . [the Mitchells] to return [sic] contract. Furthermore, when the contracts were returned, they contained a 90% financing clause that was not previously discussed. As far as . . . [the] Shane[s] were concerned . . . [the Mitchells] were not serious purchasers. If they were,

they would have returned the contract in a timely manner under their terms of their offer made to the Realtors. (Defs.' Evidentiary Hearing Ex. 13.)

On February 12, 2002, the Mitchells' litigation counsel, Steven Mitchell ("SM"), wrote to Ryan's manager, Margaret–Ann Satornino ("Satornino"), and threatened legal action if she did not contact him by February 14, 2002. (Defs.' Evidentiary Hearing Ex. 14.) Specifically, SM threatened to "file for a preliminary injunction in the Federal District court [sic]" if the matter were not resolved by the date he specified. (Defs.' Evidentiary Hearing Ex. 14.)

On February 13, 2002, Satornino wrote back to SM and informed him that the Mitchells had been given a full and fair opportunity to purchase the Property. (Defs.' Evidentiary Hearing Ex. 15.) Satornino also asked SM to contact her. (Defs.' Evidentiary Hearing Ex. 15.)

Bak wrote to SM on February 13, 2002 as well. (Defs.' Evidentiary Hearing Ex. 16.) In that letter, Bak reiterated what she had already stated to Ongioni in her February 8, 2002 letter. (Defs.' Evidentiary Hearing Ex. 16.) Bak also warned SM that the Shanes would pursue all available remedies if the Mitchells proceeded with legal action (Defs.' Evidentiary Hearing Ex. 16.)

In summation, the following occurred:

- On December 26, 2001, the Mitchells offered to the Shanes, through Kaplan, $685,000.00 for the Property with an 80% mortgage contingency clause.
- On or around December 27, 2001, the Shanes took immediate issue with the 90% financing clause contained in the Mitchells' mortgage preapproval letter.
- On December 29, 2001, Ryan prepared and sent to Ongioni, Kaplan, Bak and the Shanes a memorandum of sale listing the purchase price for the Property as $685,000.00 and stating that the sale was subject to 80% mortgage financing.
- On December 29, 2001, Kaplan also produced a memorandum of sale listing the Property's purchase price as $685,000.00 but stating 90% mortgage financing.
- On January 3, 2002 Bak sent Ongioni contracts for the Property that listed the purchase price as $685,000.00 and that stated the sale was subject to 80% financing. Bak sent those contracts under a cover letter stating that the Mitchells had ten days from receipt of the contracts to return them to Bak.
- On January 4, 2002, Ongioni received the contracts.
- On January 14, 2002, Ryan relayed the Mitchells' $8,000.00 to $10,000.00 purchase price reduction request to the Shanes. The Shanes agreed to an $8,000.00 purchase price reduction on condition that the Mitchells have the signed contracts and deposit check in Bak's office by January 17, 2002.
- On January 18, 2002, the Mitchells cut a check for $67,700.00 to Bak for the deposit and modified the contracts.
- On January 20, 2002, Selleck offered the Shanes $685,000.00 for the Property and with only $285,000.00 mortgage financing.
- On January 22, 2002, Selleck presented a mortgage preapproval letter to Ryan.
- On January 23, 2002, Bak received the Mitchells' deposit check and modified contracts. The Shanes took immediate issue with the Mitchells' unilateral mortgage contingency clause change upon receiving those contracts.
- On January 24, 2002, Ryan issued an offer and acceptance to Selleck. Bak

also sent contracts for the sale of the Property to Selleck that day.

- On January 25, 2002, Selleck signed and returned those contracts to Bak with a $68,500.00 check.
- On January 29, 2002, Bak returned the Mitchells' deposit check.
- On January 30, 2002, the Shanes signed the Selleck contract and thereby contracted to sell the Property to Selleck.

## C. Procedural History

On February 20, 2002, the Mitchells commenced this action by filing a Complaint. The next day, on February 21, 2002, SM mailed a copy of that Complaint to Century 21, the Shanes and Ryan.[11]

The Mitchells' Complaint alleges that the Defendants discriminatorily denied the Mitchells the right to purchase the Property. The Mitchells have interposed claims under the Fair Housing Act, the New York Executive Law and Title 42 U.S.C. §§ 1981 and 1982.

On February 21, 2002, SM notified the Court that the Mitchells intended to move for an order temporarily restraining the Shanes from selling the Property to Selleck. (Letter from S. Mitchell to J. Platt of 2/21/02, at 1.) At or about that same time, the Mitchells filed a lis pendens which effectively restrained the sale of the Property. On March 5, 2002, the Mitchells moved pursuant to Rule 65 of the Federal Rules of Civil Procedure for that temporary restraining order.

On March 8, 2002, the parties appeared before the Court to argue the Mitchells'

Motion for a Temporary Restraining Order. At that hearing, counsel for the Shanes, Neil J. Moritt, waived any personal jurisdiction defects and the Shanes appeared on the merits.

The Court accordingly addressed the substance of the Mitchells' Motion for a Temporary Restraining Order. After hearing from both sides, the Court determined that an evidentiary hearing was necessary to decide the Mitchells' motion. The Court also concluded that the Mitchells' motion was properly framed as one for a preliminary injunction.

Because of an ongoing criminal trial, the Court was not in a position to conduct an evidentiary hearing in a timely fashion. Accordingly, on March 8, 2002, the Court referred the Mitchells' Motion for a Preliminary Injunction to Magistrate Judge Wall so that Magistrate Judge Wall could: (1) conduct an evidentiary hearing; and (2) issue a Report and Recommendation on the merits of the Mitchells' motion. *See Mitchell v. Century 21 Rustic Realty*, No. 02–CV–1162, slip op. at 1–2 (E.D.N.Y. March 8, 2002).

On March 25, 2002, after conducting an extensive three day evidentiary hearing that produced a 344 page record, Magistrate Judge Wall issued his Report and Recommendation. *See Mitchell v. Century 21 Rustic Realty*, No. 02–CV–1162, 233 F.Supp.2d at 439–440 (E.D.N.Y. March 25, 2002). Magistrate Judge Wall found "not a shred of evidence to support or even suggest that discrimination played any part" in the Shanes' decision to contract to

---

**11.** SM has affirmed that "on FEBRUARY 21, 2002 he served a copy of the summons and complaint via the United States Postal service [sic] upon the defendants in this action by mailing the documents." (Mitchell Mot. for TRO Ex. G.) By merely mailing the Summons and Complaint to the Defendants, SM improperly served them, *see* Fed. R. Civ. P. 4(c)(1)-(2), and thereby failed to obtain personal jurisdiction over them. *See Lowman v. Burrell*, No. 99–9179, 2000 WL 1508881, at *1, 2000 U.S.App. LEXIS 25445, at *1–2 (2d Cir. Oct. 11, 2000); *Stoianoff v. Comm'r of Motor Vehicles*, No. 99–7363, 2000 WL 287720, at *1, 2000 U.S.App. LEXIS 4314, at *2 (2d Cir. March 16, 2000).

sell the Property to Selleck and accordingly recommended that this Court deny the Mitchells' Motion for a Preliminary Injunction. *Id.* at 442.

Magistrate Judge Wall instructed the parties that they had ten days from the date he issued his Report and Recommendation on March 25, 2002 to file objections with the Clerk of the Court. *Id.* at 444. Magistrate Judge Wall also directed the parties that they would waive any right to appeal this Court's Order if they failed to object to the Report and Recommendation within that time. *Id.*

On April 8, 2002, the Mitchells objected to Magistrate Judge Wall's Report and Recommendation. The Mitchells specifically object to Magistrate Judge Wall's: (1) recommendation that this Court deny their Motion for a Preliminary Injunction; and (2) decision to deny them discovery concerning Selleck's ability to purchase the Property.

After reviewing the Evidentiary Hearing record several times and considering the relevant law, the Court now: (1) OVERRULES the Mitchells' objections to Magistrate Judge Wall's Report and Recommendation; (2) AFFIRMS and ADOPTS the same as an Order of this Court; (3) DENIES the Mitchells' Motion for a Preliminary Injunction; and (4) AFFIRMS Magistrate Judge Wall's denial of discovery.

## DISCUSSION

### A. Timeliness of the Mitchells' Objections

The Mitchells interposed timely objections to Magistrate Judge Wall's Report and Recommendation. Accordingly, the Court will consider those objections having found that the Mitchells did not waived any right to object to that Report and Recommendation.

Rule 6 of the Federal Rules of Civil Procedure governs the computation of time periods. That rule provides in relevant part that:

> [i]n computing any period of time prescribed or allowed by ... order of the court, ... the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday .... When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays. Sundays, and legal holidays shall be excluded in the computation.

FED. R. CIV. P. 6(a). Three days must also be added to any computed time period to account for service. *Id.* (6)(e); *see Vargas v. Stern*, No. 98 Civ. 3376, 2000 U.S. Dist. LEXIS 2190, at *2, n. 1 (S.D.N.Y. Feb. 29, 2000); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F.Supp.2d 457, 469 n. 9 (S.D.N.Y.1999); *see also* FED. R. CIV. P. 5(b)(2)(B)-(D).

The ten day period for the parties to object to Magistrate Judge Wall's Report and Recommendation began to run on March 26, 2002. *See* FED. R. CIV. P. 6(a). That ten day period was extended by four days because of intermediate Saturdays and Sundays. *See id.* An additional three days were added for service of the Report and Recommendation. *See id.* 6(e); *Vargas*, 2000 U.S. Dist. LEXIS 2190, at *2, n. 1; *Old Republic Ins. Co.*, 51 F.Supp.2d at 469 n. 9. Accordingly, the Mitchells had until April 11, 2002 to interpose objections to Magistrate Judge Wall's Report and Recommendation. *See id.*

The Mitchells objected to Magistrate Judge Wall's Report and Recommendation on April 8, 2002. Accordingly, those objections are timely and will be considered by the Court.

## B. Objections to Magistrate Judge Reports and Recommendations and the Standard of Review

### 1. Dispositive Motions

■ Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without consent of the parties. FED. R. CIV. P. 72(b). Motions for preliminary injunctions are dispositive matters. *See Algonquin Power Corp. v. Trafalgar Power*, No. 5:00–CV–1246, 2000 U.S. Dist. LEXIS 20331, at *2 (N.D.N.Y. Nov. 8, 2000); *Odom v. Senkowski*, No. 96–CV–554, 1997 WL 458450, at *1, 1997 U.S. Dist. LEXIS 11780, at *3 (N.D.N.Y. Aug.7, 1997); *Rivera v. New York City Hous. Auth.*, No. 94 Civ. 4366, 1995 WL 546936, at *1, 1995 U.S. Dist. LEXIS 13166, at *1 (S.D.N.Y. Sept. 14, 1995).

Reports and recommendations on dispositive matters are reviewed *de novo*. FED. R. CIV. P. 72(b). Accordingly, because the Mitchells' Motion for a Preliminary Injunction is dispositive, that aspect Magistrate Judge Wall's Report and Recommendation advising denial of that motion must be reviewed *de novo*. *See id.; Algonquin Power Corp.*, 2000 U.S. Dist. LEXIS 20331, at * 2; *Odom*, 1997 WL 458450, at *1, 1997 U.S. Dist. LEXIS 11780, at *3; *Rivera*, 1995 WL 546936, at *1, 1995 U.S. Dist. LEXIS 13166, at *1.

### 2. Non–Dispositive Motions

■ Rule 72 of the Federal Rules of Civil Procedure also permits magistrate judges to conduct proceedings on non-dispositive pretrial matters. FED. R. CIV. P. 72(a). District courts reviewing non-dispositive pretrial orders may not modify or set aside any part of those orders unless they are clearly erroneous or contrary to law. *Id.; McGrath v. Nassau County Health Care Corp.*, 204 F.R.D. 240, 242–43 (E.D.N.Y.2001) (Platt, J.); *Mathias v. Jacobs*, 167 F.Supp.2d 606, 622 (S.D.N.Y. 2001); *In re Health Mgmt.*, No., 96–CV–0889, 1999 U.S. Dist. LEXIS 22729, at *12 (E.D.N.Y. Sept. 25, 1999).

Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *McGrath*, 204 F.R.D. at 243; *Lanzo v. City of New York*, No. 96–CV–3242, 1999 WL 1007346, at *2–3, 1999 U.S. Dist. LEXIS 16569, at *7–8 (E.D.N.Y. Sept. 21, 1999). That standard imposes a heavy burden on the objecting party and only permits reversal where the magistrate judge abused his discretion. *McGrath*, 204 F.R.D. at 243; *Mathias*, 167 F.Supp.2d at 622; *Lanzo*, 1999 WL 1007346, at *2–3, 1999 U.S. Dist. LEXIS 16569, at *7–8.

Discovery orders are generally non-dispositive pretrial orders. *Thomas E. Hoar. Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990); *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 85–86 (S.D.N.Y.2002); *Moss v. Enlarged City Sch. Dist.*, 166 F.Supp.2d 668, 670 (N.D.N.Y.2001). Accordingly, Magistrate Judge Wall's discovery rulings must be reviewed under the highly deferential clearly erroneous or contrary to law standard.[12]

## C. Preliminary Injunctions Generally

■ Rule 65 of the Federal Rules of Civil Procedure permits parties to move for preliminary injunctions on notice to the other party. FED. R. CIV. P. 65(a). To

---

12. The Court notes that Magistrate Judge Wall did not make any specific recommendations to this Court concerning any discovery rulings he made during the Evidentiary Hearing. However, for the purposes of economy and resolving the Mitchells' motion, the Court will treat the Mitchells' discovery ruling objections as if Magistrate Judge Wall had recommended denying those discovery requests.

obtain preliminary injunctions, moving parties must establish that: " '1) absent injunctive relief, ... [they] will suffer irreparable harm, and 2) either a) that ... [they are] likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.' " *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir.2001) (quoting *Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir.1999)); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir.2000); *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000).

## D. Irreparable Harm

■ Proof of irreparable harm is the key to obtaining preliminary injunctive relief. *EarthWeb, Inc. v. Schlack*, No. 99-9302, 2000 WL 1093320, at *2, 2000 U.S.App. LEXIS 11446, at *5 (2d Cir. May 18, 2000); *Levinson v. Cello Music & Film Sys.*, No. 98-9630, 1999 WL 980949, at *1-2, 1999 U.S.App. LEXIS 26871, at *4-5 (2d Cir. Oct. 22, 1999); *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999); *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). Accordingly, parties moving for preliminary injunctions must first demonstrate that the injury they will purportedly suffer: (1) is neither remote nor speculative; and (2) may not be compensated by money damages. *EarthWeb, Inc.*, 2000 WL 1093320, at *2, 2000 U.S.App. LEXIS 11446, at *5-6; *Levinson*, 1999 WL 980949, at *2, 1999 U.S.App. LEXIS 26871, at *5; *Rodriguez*, 175 F.3d at 234; *Reuters, Ltd.*, 903 F.2d at 907.

■ Loss of an interest in real property is generally considered irreparable harm. *See Varsames v. Palazzolo*, 96 F.Supp.2d 361, 367 (S.D.N.Y.2000); *Ciocca v. Clinton County*, No. 99-CV-1815, 1999 U.S. Dist. LEXIS 22401, at *7 (N.D.N.Y. Nov. 20, 1999); *see also Southland Corp. v. Froelich*, 41 F.Supp.2d 227, 242 (E.D.N.Y.1999) (Scybert, J.). Loss of an interest in real property is not presumed to be irreparable harm however. *See Medgar Evers Houses Assocs., L.P. v. Carro*, No. 01-CV-6107, 2001 WL 1456190, at *4, 2001 U.S. Dist. SUP CT MEM 03—1.00 LEXIS 18594, at *11 (E.D.N.Y. Nov.6, 2001).

The Mitchells have demonstrated that they would suffer irreparable harm if not permitted to close on the Property. While the loss of real property does not cause irreparable harm per se, *see id.*, loss of their interest in this Property would irreparably damage the Mitchells. *See Varsames*, 96 F.Supp.2d at 367; *Ciocca*, 1999 U.S. Dist. LEXIS 22401, at *7; *see also Southland Corp.*, 41 F.Supp.2d at 242.

First, the Mitchells would be tangibly injured if they were improperly denied the right to close on the Property because the Shanes would presumably close with Selleck as quickly as permitted. *See EarthWeb, Inc.*, 2000 WL 1093320, at *2, 2000 U.S.App. LEXIS 11446, at *5-6; *Levinson*, 1999 WL 980949, at *2, 1999 U.S.App. LEXIS 26871, at *5; *Rodriguez*, 175 F.3d at 234; *Reuters, Ltd.*, 903 F.2d at 907. Secondly, money damages would not properly compensate the Mitchells for the time and personal effort they invested in attempting to purchase the Property if they were inappropriately denied the right to close on it. *See EarthWeb, Inc.*, 2000 WL 1093320, at *2, 2000 U.S.App. LEXIS 11446, at *5-6; *Levinson*, 1999 WL 980949, at *2, 1999 U.S.App. LEXIS 26871, at *5; *Rodriguez*, 175 F.3d at 234; *Reuters, Ltd.*, 903 F.2d at 907. Accordingly, the Mitchells have demonstrated that they would suffer irreparable harm if the Property were improperly sold to Selleck and have therefore satisfied their first burden.

### E. Likelihood of Success on the Merits or Questions Going to the Merits with Hardships Decidedly Favoring Movants

The Mitchells second burden is to show either "a) that ... [they are] likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" *No Spray Coalition, Inc.,* 252 F.3d at 150 (quoting *Otokoyama Co.,* 175 F.3d at 270); *Tunick,* 209 F.3d at 70; *Wright,* 230 F.3d at 547. The Mitchells have failed to satisfy that burden.

### 1. The Fair Housing Act and New York Executive Law

The Mitchells allege that Century 21 and Ryan violated the Fair Housing Act and the New York Executive Law by denying the Mitchells their right to purchase the Property. (Compl.¶ 31.) [13] The Mitchells also allege that Century 21 discriminated against them by endorsing Ryan's departure from purported procedural norms and local customs for the sale of real property on Long Island. (Compl.¶¶ 32–33.) Those claims are properly characterized as claims for intentional discrimination or disparate treatment.

The Fair Housing Act ("FHA") prohibits parties, in relevant part, from: (1) refusing to sell or negotiate the sale of a dwelling to any person after a bona fide offer has been made because of that person's race or color; and (2) discriminating against any person "in the terms, conditions, or privileges of sale ... of a dwelling" because of that person's race or color.[14] 42 U.S.C. § 3604(a)-(b) (1994). Disparate treatment FHA claims are analyzed under the Title VII burden shifting test established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("*McDonnell Douglas* Test").[15] *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 281 F.3d 333, 347 (2d Cir.2002); *Mealey v. Apartment Rentals,* No. 96–9025, 1997 WL 592831, at *2–3, *3 n. 1, 1997 U.S.App. LEXIS

---

**13.** The allegations contained in the Mitchells' Fair Housing Act claim and their New York Executive Law claim are identical, right down to the paragraph numbers. (Compl.¶¶ 30–34.) The Mitchells' Fair Housing Act claim is contained in paragraphs 30 through 34 of the Complaint. (Compl.¶¶ 30–34.) The Mitchells' New York Executive Law claim appears in four separate but identical paragraphs that follow the Fair Housing Act claim that are also numbered paragraphs 30 through 34. (Compl.¶¶ 30–34.) That oversight occurred because SM clearly cut and paste the Mitchells' Fair Housing Act claim into their New York Executive Law claim, but neglected to renumber the paragraphs. (Compl.¶¶ 30–34.) Nonetheless, the Court will refer to both claims as appearing in paragraphs 30 through 34 of the Complaint.

**14.** The New York Executive Law similarly forbids refusing to sell a dwelling because of race, creed, color or national origin. N.Y. Exec. Law § 296(5)(a)(1) (Consol.2002).

**15.** Claims of intentional discrimination under section 296(5) of the New York Executive Law are also analyzed under the *McDonnell Douglas* Test. *See Open Hous. Ctr., Inc. v. Kessler Realty, Inc.,* No. 96–CV–6234, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19 (E.D.N.Y. Sept. 18, 2001); *Broome v. Biondi,* 17 F.Supp.2d 211, 216 (S.D.N.Y. 1997); *Cmty. Protestant Church of Co–Op City v. Riverbay Corp.,* No. 91 Civ. 4887, 1991 WL 196269, at *3–4, 1991 U.S. Dist. LEXIS 13298, at *10–12 (S.D.N.Y. Sept. 24, 1991). Accordingly, the Court's analysis of the Mitchells' Fair Housing Act claim also applies equally to their New York Executive Law claim. *See Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19; *Broome,* 17 F.Supp.2d at 216; *Cmty. Protestant Church of Co–Op City,* 1991 WL 196269, at *3–4, 1991 U.S. Dist. LEXIS 13298, at *10–12.

26394, at *8–10, *9 n. 1 (2d Cir. Sept. 24, 1997); *see Hack v. President & Fellows of Yale College,* 237 F.3d 81, 90–91 (2d Cir.2000); *Salute v. Stratford Greens Garden Apts.,* 136 F.3d 293, 302 (2d Cir. 1998).

█ Under the *McDonnell Douglas* Test, plaintiffs must first present a prima facie case of discrimination. *See Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Hack,* 237 F.3d at 90–91; *Salute,* 136 F.3d at 302; *Mealey v. Apartment Rentals,* No. 96–9025, 1997 WL 592831, at *2–3, *3 n. 1, 1997 U.S.App. LEXIS 26394, at *8–10, *9 n. 1. Plaintiffs may demonstrate prima facie disparate treatment by proving: (1) membership in a protected class; (2) that they sought and qualified for the dwelling at issue; (3) that they were denied the right to procure the dwelling; and (4) that the dwelling remained available after being denied to them. *Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes v. Lillian Goldman Family, LLC,* 153 F.Supp.2d 435, 449 (S.D.N.Y.2001); *United States v. Salvation Army,* No. 96 Civ. 2415, 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19 (S.D.N.Y. Sept. 23, 1999); *see Open Hous. Ctr., Inc. v. Kessler Realty, Inc.,* No. 96–CV–6234, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19 (E.D.N.Y. Sept. 18, 2001); *see also Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347.

█ If plaintiffs establish a prima facie case, the burden then shifts to defendants to produce a legitimate, non-discriminatory reason for their denial to sell the housing. *Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Salute,* 136 F.3d at 302. Defendants must present admissible evidence that explains that denial. *Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9.

█ If defendants produce admissible evidence that supports their legitimate, non-discriminatory reason for refusing to sell the housing, then the *McDonnell Douglas* framework disappears and plaintiffs must prove discrimination in ·fact. *See Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347 (noting that question becomes one of discrimination *vel non* ). Plaintiffs must accordingly demonstrate by a preponderance of the· evidence that the defendants' purportedly legitimate reasons were in fact pretextual. *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *18; *Hughes,* 153 F.Supp.2d at 450

### a. The Mitchells Failed to Present a Prima Facie Housing Discrimination Case

█ The Mitchells failed to present a prima facie housing discrimination case. Accordingly, both their FHA and New York Executive Law claims must fail and their preliminary· injunction motion must be denied.

The Mitchells are members of a protected class. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes,* 153 F.Supp.2d at 449; *Salvation Army,* 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19. However, the Mitchells did not qualify for the Property at the time for contracting, they.were not denied the right to procure the Property, and the Property did not remain available after they were denied the ability to purchase it. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes,* 153 F.Supp.2d at 449; *Salvation Army,* 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Open Hous. Ctr., Inc.,* 2001 WL

1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19.

First, the Mitchells did not qualify for the Property under the Shanes' conditions because they failed to produce 80% mortgage financing by the time the Shanes required it. *See Mealey*, 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes*, 153 F.Supp.2d at 449; *Salvation Army*, 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.*, 281 F.3d at 347; *Open Hous. Ctr., Inc.*, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19. Contract law permits offerors to set the terms of acceptance, and the Mitchells' failure to satisfy those terms by the time required rendered them unqualified for the Property, regardless of any actual financial ability to secure 80% financing.[16]

Secondly, the Mitchells were not denied an opportunity to purchase the Property. *See Mealey*, 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes*, 153 F.Supp.2d at 449; *Salvation Army*, 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.*, 281 F.3d at 347; *Open Hous. Ctr., Inc.*, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19. The Mitchells were given several opportunities to purchase the Property and were in fact sent contracts. Had the Mitchells simply signed those contracts as sent (with the agreed upon price changes) and returned them within the time periods imposed, they would most likely have the Property today.

Finally, the Property did not remain available after the Shanes decided not to sell to the Mitchells. *See Mealey*, 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes*, 153 F.Supp.2d at 449; *Salvation Army*, 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.*, 281 F.3d at 347; *Open Hous. Ctr., Inc.*, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19. After the Shanes received the Mitchells' counteroffer in writing, they decide the Mitchells were not serious purchasers and contracted with Selleck. The Mitchells' lawsuit and lis pendens are the only reasons that contract has not been closed on. Accordingly, while the Property may theoretically remain available, it is off the market for all intents and purposes and does not remain available to the Mitchells.

Consequently, because the Shanes did not discriminate against the Mitchells, it is difficult to understand how Ryan discriminated against them or how Century 21 could have ratified any purportedly improper behavior. Ryan did not deviate from any supposed procedural norms by presenting the Selleck deal to the Shanes before they signed the Mitchell contracts because real estate deals are not complete until both parties sign the sales contract.

Moreover, the Mitchells' allegation that Ryan should have forced the Shanes to entertain bids from the Mitchells after learning of their race is meritless and nonsense. The Mitchells were given several opportunities to bid and ample time to sign the contracts. Their failure to do so is their own fault.

Accordingly, Ryan did not depart from any purported procedural norms and did

---

**16.** The Court notes that the Mitchells in fact qualified for 80% mortgage financing on March 1, 2002. (R. at 204:14–22.) Qualification at that time is inapposite, however. The Shanes required the Mitchells to have 80% mortgage financing by either January 14, 2002 or January 17, 2002, and the Mitchells did not have such financing at either of those times. Accordingly, the Mitchells were unqualified to purchase the Property at the time required and were therefore unqualified for all intents and purposes.

not discriminate against the Mitchells. If anything, Ryan afforded the Mitchells special consideration by convincing the Shanes to accept an $8,000.00 purchase price reduction, as the Mitchells themselves recognized when they thanked him through Bak for doing so. (R. at 106:18–107:02.) Consequently, Century 21 could not have discriminated against the Mitchells either by ratifying Ryan's behavior.

Therefore, the Mitchells have failed to establish prima facie FHA or New York Executive Law violations. Those claims must fail, and the Mitchells' Motion for a Preliminary Injunction must accordingly be denied.

### b. The Shanes have Proffered a Legitimate, Non–Discriminatory Reason for Their Actions that Defeats Any Claim Against Ryan or Century 21

The Mitchells' claims fail even if the Court presumes they have established a prima facie case, because the Shanes proffered legitimate, nondiscriminatory reasons for not selling to the Mitchells and produced admissible evidence to support those reasons. *See Reg'l Econ. Cmty. Action Program, Inc.*, 281 F.3d at 347; *Salute*, 136 F.3d at 302. The Shanes' legitimate, nondiscriminatory reasons defeat any suggestion that Ryan or Century 21 acted improperly as well. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9.

The Shanes chose not sell the Property to the Mitchells because after several months of bidding and negotiating that culminated in contracts being sent to the Mitchells, the Mitchells unilaterally changed the mortgage contingency clause (Defs.' Evidentiary Hearing Ex. 5) and returned the contracts well beyond the time limits set by the Shanes and Bak. (R. at 105:17–21, 158:22–24; Defs.' Evidentiary Hearing Ex. 3.) The Shanes, who were wholly ignorant of the Mitchells' race during the entire contracting process (R. at 77:11–78:05, 141:10–17), were already frustrated by the Mitchells' purchase price reduction and found the Mitchells' changes and delays unacceptable. (R. at 69:13–23.) The Shanes therefore chose to contract with a ready, willing and able buyer who was offering a higher price and better terms. The Shanes actions were perfectly legitimate and completely within their rights. The Shanes also produced admissible testimony that supports their reasons. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9.

Accordingly, it is again difficult to see how Ryan or Century 21 acted improperly in light of the Shanes' legitimate conduct. Ryan did not coax the Shanes into accepting the Selleck deal (whereas he had pressured the Shanes into accepting the reduced Mitchell purchase price) and Ryan did not refuse to entertain bids after learning the Mitchells were African American. In fact, Ryan knew the Mitchells were African American when he persuaded the Shanes to accept the Mitchells' diminished counteroffer. (R. at 152:22–153:01, 10–11, 155:21–156:06.) Accordingly, Ryan did not discriminate against the Mitchells, and Century 21 could not have acted improperly by ratifying his behavior.

In sum, the Shanes presented legitimate, non-discriminatory reasons for not selling the Property to the Mitchells and supported those reasons with admissible evidence. The Shanes' legitimate, non-discriminatory reasons validate Ryan's and Century 21's actions. Consequently, the Mitchells' FHA and New York Executive Law claims must fail and their Motion for a Preliminary Injunction must accordingly be denied.

### c. The Mitchells Failed to Prove Discrimination in Fact by a Preponderance of the Evidence, Did not Establish that the Shanes' Reasons for Selling the Property to Selleck were Pretextual and Failed to Show that Ryan Discriminated Against Them

Finally, the Mitchells failed to prove by a preponderance of the evidence that the Shanes discriminated against them, that their reasons for selling the Property to Selleck were pretextual, or that Ryan or Century 21 discriminatorily influenced that decision.

The Mitchells argue that Ryan discriminated against them by "severely depart[ing] from the procedural norms and local customs on Long Island with respect to the sale of real property," and that Century 21 discriminated against them by endorsing Ryan's actions. (Compl.¶¶ 30–34.) The evidence in fact demonstrates that Ryan entreated the Shanes to accept the Mitchells' diminished deal, and that it was Ryan that held the Mitchells' deal together beyond the point where it would have survived on its own. (R. at 105:09–18.) The Mitchells acknowledged as much when they thanked Ryan for his efforts in securing the $8,000.00 purchase price reduction. (R. at 106:18–107:18.)

It is therefore unclear, in light of Ryan's aggressive efforts to consummate the Mitchells' deal, what procedural norms he departed from. While there was some testimony that brokers might tell other bidding parties about outstanding offers and acceptances (R. at 127:04–17, 128:04–06), there was equal testimony that there was no obligation to do so. (R. at 100:21–101:10, 126:11–15, 131:05–132:01.)

While there was also some suggestion that Bak held onto the Mitchells' deposit check in an effort to subvert their endeavors to purchase the Property (R. at 46:09–11), the testimony demonstrated that parties do not return checks until alternate deals are almost complete and alternate buyers have signed the contracts. (R. at 47:10–19, 49:02–25, 51:09–12.) The Mitchells consequently failed to prove by a preponderance of the evidence what the procedural norms are or that Ryan departed from them, and in light of the help Ryan provided them, it is highly unlikely his actions were pretextual. *See Reg'l Econ. Cmty. Action Program, Inc.*, 281 F.3d at 347; *Open Hous. Ctr., Inc.*, 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *18; *Hughes*, 153 F.Supp.2d at 450.

Accordingly, Ryan did not act discriminatorily. Century 21's endorsement of Ryan's behavior consequently could not have itself been discriminatory. Therefore, the Mitchells failed to prove by a preponderance of the evidence that the Shane's, Ryan's or Century 21's actions were pretextual or discriminatory in fact and their Motion for a Preliminary Injunction must be denied.

### 2. Claims Under 42 U.S.C. §§ 1981 and 1982

The Mitchells have also interposed §§ 1981 and 1982 claims directly against the Shanes. Specifically, the Mitchells allege that the Shanes discriminated against them by: (1) "requiring ... an 80% mortgage contingency as opposed to 90% mortgage contingency when the usual custom and practice is that the sellers are not concerned with the percentage of equity the purchaser holds;" (2) "unilaterally rejecting the Mitchells offer to meet the sellers demand for an 80% mortgage contingency without giving them an opportunity to meet this demand;" (3) "keeping the property on the market after the Mitchells agreed to meet all the terms and conditions the sellers required for purchase of the property, including the 80% mortgage contingency;" and (4) "refusing to accept any bids from the Mitchells for

the property after the plaintiffs, suggested through their attorney, that they believed they were denied the property because of racial discrimination." (Compl.¶¶ 37, 42.) Those allegations are baseless and do not provide grounds for concluding that the Shanes discriminated against the Mitchells.

Section 1981 of the United States Code provides all persons within the United States' jurisdiction the same right as white citizens to make and enforce contracts. 42 U.S.C. § 1981(a) (1994). Section 1982 of the United States Code affords all United States citizens the equal right "to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id.* § 1982.

 Those statutes collectively prohibit housing discrimination. *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *9, 2001 U.S. Dist. LEXIS 17596, at *27. Housing discrimination claims brought under §§ 1981 and 1982 are analyzed under the *McDonnell Douglas* Test. *Id.,* 2001 WL 1328446, at *9, 2001 U.S. Dist. LEXIS 17596, at *29; *Broome,* 17 F.Supp.2d at 216; *Cmty. Protestant Church of Co–Op City,* 1991 WL 196269, at *3–4, 1991 U.S. Dist. LEXIS 13298, at *10–12.

### a. The Mitchells' Allegations Supporting Their §§ 1981 and 1982 Claims are Factually Spurious

 The four grounds posited by the Mitchells that purportedly support §§ 1981 and 1982 violations are factually wrong or inapposite. Accordingly, the Mitchells' direct claims against the Shanes must fail and their Motion for a Preliminary Injunction must be denied.

First, the Mitchells failed to establish that sellers are typically not concerned with buyers' financing. Bak testified that the amount of equity a purchaser puts into a home is important and that it was of consequence to the Shanes. (R. at 25:01–

07, 38:23–39:02.) Ryan similarly concluded that the amount of equity a buyer furnishes is meaningful and that it was consequential to the Shanes. (R. at 111:21–112:07, 112:20–113:02, 115:18–116:05, 120:19–121:04.) Ongioni recognized as much as well. (R. at 251:11–20, 254:19–255:05, 255:23–256:04; 260:21–261:02.)

While Kaplan testified that financing may not generally make a difference to buyers, she did not know whether or not it was important to the Shanes. (R. at 307:04–14.)

Accordingly, the balance of the testimony supports the conclusion that financing is generally significant to buyers and that it certainly was meaningful to the Shanes. The Mitchells' contention that the Shanes' interest in 80% financing is discriminatory is therefore simply wrong.

Secondly, the Shanes did not unilaterally deny the Mitchells the opportunity to meet their 80% mortgage financing demand. The Mitchells had several weeks to accrue that financing and had ample opportunity to discuss with the Shanes any financing issues they may have encountered. The Mitchells certainly could have raised any financing questions with the Shanes before crossing out the contingency clause in the contracts and signing them. Therefore, the Mitchells' second factual contention is similarly wrong.

Thirdly, the Shanes did not keep the Property on the market after the Mitchells had met all of the their conditions. Once the Shanes learned of the Mitchells' unilateral alteration of the mortgage contingency clause, they effectively took the Property off the market on January 25, 2002 by sending contracts to Selleck, who was offering a higher price and significantly better terms. Moreover, the Mitchells never met the Shanes' conditions until they committed to receive 80% mortgage financing on January 30, 2002[17] and did not receive

---

17. By that point, the Shanes had already signed the Selleck contracts.

that financing until March 1, 2002. Accordingly, the Mitchells never met the Shanes' terms while the Property was on the market and the Mitchells' third position is also incorrect.

Finally, the Mitchells' contention that it was discriminatory for the Shanes not to accept further bids from them after the Mitchells threatened a federal discrimination lawsuit is inapposite. The Shanes stopped accepting bids from the Mitchells well before Ongioni's February 1, 2002 letter because Selleck had already presented them a much better price and much better terms. Consequently, the Shanes' declination to deal further with the Mitchells after accepting a better offer is irrelevant to this case.

Accordingly, the Mitchells lack a factual basis for their §§ 1981 and 1982 claims against the Shanes. Those claims therefore fail, as must the Mitchells' Motion for a Preliminary Injunction.

### b. The Mitchells §§ 1981 and 1982 Claims Fail Under the *McDonnell Douglas* Test

The Mitchells' claims also fail under the *McDonnell Douglas* Test. First, as stated earlier, the Mitchells did not state a prima facie discrimination case because, while they are members of a protected class, they did not qualify for the Property, they were not denied the right to purchase the Property, and the Property did not remain available to them after they were denied the ability to purchase it. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes,* 153 F.Supp.2d at 449; *Salvation Army,* 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19; DISCUSSION Sec. E.1.a., *supra.*

Secondly, even if the Mitchells stated a prima facie discrimination claim, the Shanes posited legitimate, non-discriminatory reasons for selling to Selleck and supported those reasons with admissible evidence. *See Mealey,* 1997 WL 592831, at *3, 1997 U.S.App. LEXIS 26394, at *9; *Hughes,* 153 F.Supp.2d at 449; *Salvation Army,* 1999 WL 756199, at *7, 1999 U.S. Dist. LEXIS 14861, at *19; *see also Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *19; DISCUSSION Sec. E.1.b., *supra.*

Finally, the Mitchells did not carry their burden of showing discrimination *vel non* by a preponderance of the evidence, because they failed to demonstrate that the Shanes' reasons for selling the Property to Selleck were pretextual or illegitimate. *See Reg'l Econ. Cmty. Action Program, Inc.,* 281 F.3d at 347; *Open Hous. Ctr., Inc.,* 2001 WL 1328446, at *6, 2001 U.S. Dist. LEXIS 17596, at *18; *Hughes,* 153 F.Supp.2d at 450; DISCUSSION Sec. E.1.c., *supra.*

Therefore, the Mitchells have not demonstrated that the Shanes violated §§ 1981 or 1982. The Mitchells' Motion for a Preliminary Injunction must accordingly be denied.

### 3. Consequences of the Mitchells' Failure to State FHA, New York Executive Law and §§ 1981 and 1982 Claims

The Mitchells have failed to demonstrate that they are likely to succeed on the merits of their FHA, New York Executive Law or §§ 1981 and 1982 claims. *See No Spray Coalition, Inc.,* 252 F.3d at 150; *Tunick,* 209 F.3d at 70; *Wright,* 230 F.3d at 547. Those claims are weak and would probably not survive summary judgment.

The Mitchells have not raised sufficiently serious questions going to the merits of their FHA, New York Executive Law and §§ 1981 and 1982 claims either, because there is little likelihood the Mitchells would prevail on those claims at trial. *See No Spray Coalition, Inc.*, 252 F.3d at 150; *Tunick*, 209 F.3d at 70; *Wright*, 230 F.3d at 547. Moreover, the hardships do not decidedly favor the Mitchells, because the Shanes are currently losing the benefit of a $685,000.00 deal and are suffering an attendant monetary time value loss as well. *See No Spray Coalition, Inc.*, 252 F.3d at 150; *Tunick*, 209 F.3d at 70; *Wright*, 230 F.3d at 547.

Therefore, the Mitchells have not satisfied the second prong of the preliminary injunction test. Their Motion for a Preliminary Injunction must consequently be denied.

**F. Discovery Requests**

The Mitchells have also objected to Magistrate Judge Wall's determination during the Evidentiary Hearing that the Mitchells were not entitled, at this stage of the case, to discovery of certain financial information about Selleck. After considering the purpose for which that material was sought, and treating Magistrate Judge Wall's rulings as part of his Report and Recommendation, the Court concludes that the Mitchells did not satisfy their heavy burden of showing that Magistrate Judge Wall's decision to deny them that discovery was clearly erroneous or contrary to law. *See* FED. R. CIV. P. 72(a); *McGrath*, 204 F.R.D. at 242–43; *Mathias*, 167 F.Supp.2d at 622; *In re Health Mgmt.*, 1999 U.S. Dist. LEXIS 22729, at *12. Accordingly, that objection is also overruled.

**CONCLUSION**

The Mitchells have failed to demonstrate that they are entitled to a preliminary injunction or that Magistrate Judge Wall's discovery rulings were clearly erroneous

or contrary to law. Accordingly, Magistrate Judge Wall's Report and Recommendation of March 25, 2002, is AFFIRMED and is ADOPTED as an Order of this Court. The Mitchells' Motion for a Preliminary Injunction is DENIED and the Court AFFIRMS Magistrate Judge Wall's denial of their discovery request.

SO ORDERED.

**REPORT AND RECOMMENDATION**

WALL, United States Magistrate Judge.

Before the court, on referral from District Judge Thomas C. Platt, is the motion of the plaintiffs Clarence and Aischa Mitchell (the "Mitchells") for a preliminary injunction seeking to restrain the defendants from selling real property located at 2548 Deerfield Road, Southampton, New York (the "Property"), to any purchasers other than the plaintiffs. The essence of the plaintiffs' underlying claim is that they have been denied the right to purchase the Property because of their race, in violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq., 42 U.S.C. §§ 1981, 42 U.S.C. § 1982, and the New York Executive Law § 296(5)(a)(1). For the reasons set forth below, the undersigned recommends that the injunction be denied.

**BACKGROUND**

The Mitchells are an African–American couple who currently reside in the City of New York. In May 2001, the Mitchells contacted Robin Kaplan ("Kaplan"), a licensed real estate agent employed by Allan M. Schneider Associates, and indicated their desire to be shown homes on the eastern end of Long Island. In December 2001, the Mitchells were shown the subject Property, which is owned by the defendants Sheila and Harvey Shane (the "Shanes"). The Shanes had listed their

property for sale with the defendant Century 21 Rustic Realty ("Century 21") in or about March 2000. Allan M. Schneider Associates was permitted to show the Property pursuant to a co-brokering agreement. The listing agent is the defendant Matthew Ryan ("Ryan"). The original asking price for the home was $895,000. At the time the Mitchells first saw the Property, the asking price had been reduced to $699,000.

In early December, the Mitchells made an offer on the property for $655,000. Tr. 3/11 at 153. Clarence Mitchell testified that he and his wife left for a holiday vacation with that offer outstanding. *Id.* While they were on vacation, the Mitchells were contacted by Kaplan, who indicated that the Shanes had another offer on the home for $672,000 from Michael Selleck ("Selleck"), who is the contract vendee of the Property. *Id.* at 154. On December 26, 2001, the Mitchells asked Kaplan to increase the offer to $685,000. In response to their request, Kaplan faxed the following offer to Ryan:

Dear Matthew:

Mr. & Mrs. Mitchell of 331 West 84th St., NYC have asked me to proffer an offer of $685,000 to M/M Shane. This is subject to engineers report and 80% financing. They are able to close on or about March 1, 2001.

Defendants Ex. 1. The Shanes verbally accepted that offer.

Although the written offer to Ryan includes a mortgage contingency term, it is not clear from the testimony whether the Mitchells specifically discussed the contingency term with Kaplan prior to her conveying the offer. Tr. 3/11 at 184. Clarence Mitchell testified that Kaplan advised him that she had submitted the offer with the "standard mortgage contingencies," but he was unaware that "the 80% mortgage contingency was stipulated." *Id.*

On December 27, Kaplan's assistant, Jan Jaeger, prepared a preliminary "history sheet" which set forth the terms of the agreement. *Id.* at 298, 338. Although the December 27 history sheet was incomplete, it may have been forwarded to Ryan. The December 27 history sheet also reflected 80% financing. Defendants Ex. 18.

On or about December 28, 2001, the Mitchells were faxed a pre-approval letter for mortgage financing from the Manhattan Mortgage Company in the amount of $616,500, which amounts to 90% of the purchase price. Plaintiffs' Ex. G. Mr. Mitchell forwarded the letter to Kaplan the same day he received it. Tr. 3/13 at 295–96. Kaplan immediately forwarded a copy to Ryan. Upon receipt of a copy of the mortgage approval letter from Kaplan, Ryan contacted the Shanes, who indicated that "they wanted more equity in the property." Tr. 3/11 at 112–13. In response, Ryan contacted Kaplan and advised her that the Shanes were unhappy and that the approval letter was inconsistent with the offer. *Id.* at 113. According to Ryan, Kaplan assured him that although they "qualified for 90 percent [financing], 80 percent financing was not an issue for them." *Id.* Ryan testified that he asked Kaplan again for her assurance that the financing would not be an issue and indicated that he would prepare a "memo of sale" to be circulated to all the parties involved in the transaction reflecting that term. *Id.*

On December 29, 2001, Ryan did prepare a "memo of sale" and indicated under the heading "Purchase Terms" that the deal was subject to 80% financing. Defendants' Ex. 2. On the same day, however, Kaplan prepared her "final version" of the "history sheet" that reflected the following terms: "$615,000. financing preapproved. Subject to an engineer's report." Plaintiffs' Ex. W. Kaplan testified that she per-

sonally faxed the final version of the history sheet to Kara Bak ("Bak"), the Shanes' attorney, and to Marie Ongioni ("Ongioni"), the Mitchells' attorney. Tr. 3/13 at 310. There is no evidence before the court to suggest that the parties realized that the "memo of sale" and "history sheet" contained conflicting terms.

On January 3, 2002, Bak forwarded the sales contract to Ongioni by overnight mail. Defendants' Ex. 3 Bak's cover letter called for a $68,500 down payment and expressly stated that the offer remained open for only ten days. *Id.* Bak also requested that Ongioni contact her before making any changes to the contract. *Id.* Two days later, upon their return from vacation, the Mitchells had an engineer inspect the home. The inspector issued his report on January 10, 2002. The report set forth a number of items requiring repair or replacement and estimated that the cost of such repairs would amount to approximately $20,000 to $25,000. As a result, the Mitchells asked Kaplan to seek an $8,000 reduction in the purchase price so that they could recoup some of the repair costs. Tr. 3/11 at 157–58.

On January 14, 2002, Kaplan contacted Ryan to negotiate the price reduction and Ryan subsequently contacted the Shanes. Tr. 3/11 at 104. According to Ryan's testimony, the Shanes "were not pleased with this development." *Id.* Ryan indicated that Mr. Shane was "very frustrated," "felt a long period of time had gone by," and thought "the engineer's report was supposed to be FYI, so he did not expect to have a negotiating point with the engineer's report." *Id.* at 105 According to Ryan, he talked the Shanes into the price reduction but the Shanes would agree only if "the contracts were back in Bak's office with checks by Wednesday the 16th." *Id.* Ryan advised the Shanes that their time schedule was probably unrealistic, but indicated that he would try to have signed

contracts by Thursday, the 17th. *Id.* at 106.

On January 15, 2002, Ryan spoke to Kaplan and relayed the Shanes' acceptance of the price reduction. Kaplan, thereafter, contacted Mr. Mitchell, who was in Chicago and advised him that the Shanes had agreed to reduce the price. Tr. 3/11 at 158. Mr. Mitchell advised Kaplan that he would not be back in New York until Friday. On January 18, 2002, the Mitchells had a check drawn from their Citibank account in the amount of $67,700, 10% of the renegotiated price. They then forwarded the check to Ongioni along with a modified contract. Prior to executing the contract, the Mitchells changed the contract price from $685,000 to the agreed-upon price of $677,000 and the mortgage contingency clause from 80% to 90%. Defendants' Ex. 5. Ongioni, who had been on vacation from January 11 to January 22, testified that she was unaware that her clients intended to change either the purchase price or the mortgage contingency clause. Tr. 3/12 at 269–70.

On January 22, 2002, nineteen days after the contract had been forwarded to the Mitchells, Ongioni forwarded the modified contract, along with the down payment check, to Bak. Bak received the contracts on January 23, 2002. The same day, Selleck conveyed a new offer to the Shanes for $685,000, with a mortgage contingency of $285,000, that is, a 42% mortgage contingency. The Shanes contacted Bak to see if they were free to go ahead with the better offer. Bak indicated that they were under no contractual obligation to the Mitchells. The Shanes indicated that they would prefer to accept the new offer if the transaction could be accomplished immediately. On January 24, 2002, Bak forwarded a contract of sale to Selleck based on the terms agreed to between Selleck and the Shanes. Selleck returned executed contracts along with a check for $68,500

the next day. Defendants Ex. 6. On January 28, 2002, Bak forwarded the executed contract to the Shanes, who immediately signed and returned the contract to Bak. Defendants Exs. 7 and 8. On January 29, 2002, Bak returned the Mitchells' deposit check to Ongioni and indicated that the Shanes had rejected their offer to purchase the property subject to 90% financing. Defendants' Ex. 9.

While the Mitchells do not dispute the fact that they altered the terms of the contract or that the Shanes received a better offer, they claim, nonetheless, that the Shanes' failure to provide them an opportunity to make a better offer was driven by the Shanes' desire not to sell the property to an African–American family. Plaintiffs' "Motion for Temporary Restraining Order" at ¶¶ 9–11. They argue that there "are strong indications that racial discrimination played a part in the Shanes' decision not to sell the Property to the [them]." *Id.* at ¶ 12.

The Shanes contend that their motivation to enter into a contract with another purchaser was simple: they were offered a higher price and more favorable mortgage contingency terms after the Mitchells had insisted on a price reduction, had unilaterally changed the mortgage provision, and had delayed the signing of the contract. Letter from Morritt at 6. The defendants argue, therefore, that this is not a case of racial discrimination. The court agrees. Contrary to the plaintiffs' contentions, there is not a shred of evidence to support or even suggest that discrimination played any part in this transaction.

## DISCUSSION

"A party seeking a preliminary injunction must establish that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the mer-

its to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999).

The Mitchells seek a preliminary injunction restraining the defendants from selling the Property to any purchasers other than themselves. See Notice of Motion. Although the complaint advances twelve causes of action, the crux of the Mitchells' argument is that the defendants acted in violation of the Fair Housing Act, 42 U.S.C. §§ 1981 and 1982, and New York Executive Law § 296(5)(a)(1), in requiring the Mitchells to have an 80% mortgage contingency as opposed to a 90% mortgage contingency and in refusing to accept additional bids on the property from the Mitchells. See Complaint. The Mitchells further claim that by departing from the norms and local customs on Long Island with respect to the sale of real property, the defendants accomplished their goal of not selling the property to an African–American couple. *Id.* The defendants argue that the plaintiffs have failed to submit any evidence to support these allegations.

Assuming for the purposes of this motion that the sale of the Property to another purchaser would amount to irreparable harm, the plaintiffs must demonstrate that they are likely to succeed on the merits or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. They have failed to do so.

The plaintiffs specifically allege that the defendants violated the Fair Housing Act, 42 U.S.C. §§ 1981 and 1982, and the New York Executive Law § 295(5)(a)(the "New York Human Rights Law") by denying them their right to purchase the Property to the same extent as white citizens. See Complaint. 42 U.S.C. § 1981 prohibits

discrimination in the making and enforcing of private contracts. 42 U.S.C. § 1982 prohibits racial discrimination in the sale of real property. "Together, these statutes 'prohibit all racial discrimination, whether or not under the color of law, with respect to the rights enumerated therein— including the right to purchase or lease property.'" *The Open Housing Center, Inc. v. Kessler Realty, Inc.,* 2001 WL 1328446, at *9, 2001 U.S. Dist. LEXIS 17596 at *27 (E.D.N.Y.2001)(citing *Jones v. Alfred H. Mayer, Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)). The New York Human Rights Law also prohibits discrimination with respect to the sale of property.

The plaintiffs also allege that the defendants violated 42 U.S.C. 3604, et seq., the Fair Housing Act. See Complaint. Although not specifically cited to by the plaintiffs, section 3604(b) prohibits "discrimination against any person in the terms, conditions, or privileges of sale ... because of race, [and] color ...." Courts have consistently applied a three-part burden shifting test to both Fair Housing Act claims and to claims arising under 42 U.S.C. §§ 1981, 1982 and the New York Human Rights Law.

The burden shifting analysis is similar to the analysis used in Title VII cases:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [adverse decision]." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretext for discrimination.

*The Open Housing Center,* 2001 WL 1328446 at *5, 2001 U.S. Dist. LEXIS 17596 at *18.

In order to establish a prima facie case of discrimination, a plaintiff must show: (1) that he is a member of a protected class; (2) that he applied for and was qualified to rent or purchase the housing; (3) that he was rejected; and (4) that the housing opportunity remained available to white applicants. *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1038 (2d Cir. 1979). Under the Fair Housing Act, evidence of a discriminatory effect alone is sufficient to establish a prime facie case of discrimination. *Id.* at 1037. Claims brought under §§ 1981 and 1982, however, require a showing of discriminatory intent. *The Open Housing Center,* 2001 WL 1328446, at *9, 2001 U.S. Dist. LEXIS 17596 at *30. The plaintiffs have not set forth facts establishing a case under either statute.

Although the plaintiffs are members of a protected class who sought to purchase property, the were not rejected or refused an opportunity to do so. The plaintiffs were given several opportunities to bid on the property, they were assisted in their efforts to renegotiate the price after it had been accepted, and they were given well in excess of ten days to execute the contracts. Simply put, the plaintiffs were given more than an ample opportunity to purchase the property.

The plaintiffs do not dispute these facts, but argue that the defendants' failure to accept a 90% mortgage contingency term and to refuse to give them a chance to better their offer establishes a prima facie case of discrimination Even if the court accepts these contentions as prima facie evidence of discrimination, as stated above, the defendants have established a legitimate and nondiscriminatory reason for their decision.

The court must therefore address the third step in the burden shifting analysis, that is, whether the plaintiffs have established that the legitimate reason offered by the defendants for selling the house to Selleck as not the true reasons, but a pretext for discrimination. The plaintiffs have not done so. The court recognizes the difficulty any party faces in presenting hard evidence of racial discrimination. Here, however, evidence of a "pretext" was not presented.

At the hearing, the plaintiffs' counsel and the court specifically question Mr. Mitchell about his basis for believing that the defendants' actions were racially motivated and he responded as follows:

Q. So why do you feel this is a racial discrimination case?

A. Well, my initial thought was not that. I have to be honest here again. My wife is a little more pressing than I am. She initially thought it was. I actually cautioned her against that. "Its probably just a mistake here that we hadn't seen," I said.

But obviously after we got the news about our the rejection of our contract, we started talking to our friends. And several of them, without being prompted to say—and these are non–African–American friends—several of them said, "Do you think it's because of your race?"

After I heard this a couple of times, I thought about it and started going through a list of things it could be.

Could it be that the price [was] wrong? No, we agreed to the price.

Could it be that we did not have a preapproval letter? No, we preapproved it.

Could it be that we didn't move quickly enough? Not at all.... The two things that came up, the one specific objection was the 90 percent financing issue, which again didn't make sense because it wasn't an issue...

THE COURT: So the basis of your claim for racial discrimination is the elimination of the other causes.

Q. Do you think the reasons the Shanes turned you down are legitimate?

A. There are no legitimate reasons for them to turn us down.

Tr. 3/11 at 170–172.

In contrast to the plaintiffs' allegations that were based on speculation, the defendants' explanation for their conduct was not only plausible, it is exactly what one would except in the current real estate market. What seller wouldn't take a higher price and better terms when they have no legal obligation to do otherwise. This court believes that prior to alleging that the defendants' conduct was a pretext, the Mitchells should have examined more thoroughly their own conduct. If anything can be said to have caused this outcome, it was the failure of the parties to resolve the mortgage contingency issue prior to the Shanes' receipt of a better offer, the failure of the Mitchells to move more rapidly to contract and the fact that the Mitchells insisted on a price reduction after the engineers report. Thus, it is the undersigned's recommendation that the preliminary injunction motion be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 10 days of the date of this Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir.1996).

March 25, 2002.